The FEDERAL DEPOSIT INSURANCE CORPORATION, a federal corporation, Clark Compton, Walter Sands, Stephen Bennett, Donald Bumgarner, Emmett Egbert, Lawrence Hughes, Norval J. Ritchey, and Faye Rookard, Plaintiffs,

v.

CONTINENTAL CASUALTY COMPANY, dba CNA, Defendant.

Civ. No. 90–1100–RE.

United States District Court, D. Oregon.

Oct. 18, 1991.

Mark E. Friedman, Eric A. Lindenauer, Garvey, Schubert & Barer, Portland, Or., Jeffrey R. Williams, F.D.I.C., Legal Div., Washington, D.C., for the F.D.I.C.

Arden E. Shenker, Robert E.L. Bonaparte, Tooze Shenker Holloway & Duden, Portland, Or., Gary V. Dixon, William E. O'Brien, Jr., Joan Gerhart Mollerus, Ross, Dixon & Masback, Washington, D.C., for Continental Cas. Co.

## OPINION

REDDEN, Chief Judge:

### BACKGROUND

On September 24, 1982, the MGIC Indemnity Corp. issued a Directors' and Officers' Liability Insurance Policy (MGIC Poli-

cy) to the Bank of the Northwest (Bank), a bank in Eugene, Oregon, providing defense and insurance coverage for wrongful acts of the Bank's officers and directors and indemnity coverage for the Bank. The Policy period ran from September 24, 1982 to September 24, 1983. In September 1983, MGIC notified the Bank that it was not renewing the Policy. The Bank elected to purchase "extended discovery" coverage pursuant to paragraph 2(B) of the Policy for the period September 24, 1983 to December 23, 1983.

On November 1, 1983, the MGIC Policy and its obligations were assumed by defendant, Continental Casualty Company, dba CNA (CNA). CNA agreed to assume all MGIC policies of certain specified types (including directors and officers liability insurance policies) that were in full force and effect on November 1, 1983. CNA also agreed to pay MGIC's liability on certain claims arising prior to November 1, 1983. On August 31, 1984, the Bank was declared insolvent by the State Banking Division. Plaintiff, Federal Deposit Insurance Corporation (FDIC) was appointed receiver of the Bank. FDIC, as receiver, sold and transferred to the FDIC, in its corporate capacity, all assets and claims of the Bank material to this action. The Bank's former rights and interest in the MGIC Policy are now property of the FDIC. The FDIC now has the rights, titles and powers of any officer or director of the Bank, including those pertaining to the MGIC Policy.

On July 1, 1985, MGIC placed itself in voluntary liquidation proceedings under Wisconsin law. CNA entered into an agreement ("Putback Agreement") with WMBIC Indemnity Corporation, MGIC's successor-in-interest (WMBIC) and the Commissioner of Insurance of the State of Wisconsin as the court-appointed Liquidator of WMBIC (the Liquidator). Under the Putback Agreement, CNA attempted to transfer its obligations under the MGIC Policy to WMBIC and the Liquidator. Plaintiff alleges that the Putback Agreement is ambiguous and that the insureds under the MGIC Policy did not have notice of, nor did they consent to, the Putback Agreement.

In 1987, FDIC filed suit in Eugene, Oregon, *FDIC v. Clark Compton et al.*, Cv 87–6413–E (the Eugene FDIC action). The Eugene FDIC action alleged wrongful acts by certain officers and directors of the Bank, including all individually named plaintiffs in the action at bar.

On October 25, 1990, plaintiffs FDIC and eight individuals who are former directors and officers of the Bank (plaintiffs) filed this action against CNA alleging CNA was notified of the claims in the Eugene FDIC action and that CNA denied responsibility for those claims. Plaintiffs allege that the Putback Agreement is unconscionable as to the insureds under the MGIC Policy.

Also in 1990, plaintiffs filed proofs of claims against WMBIC in the liquidation proceedings in Wisconsin state court, seeking a determination that the Policy provides coverage for the same claims as the claims at issue in this proceeding. *See In re WMBIC Indemnity Segregated Account*, 85–CV–3361. The Deputy Liquidator recommended denial of the individual directors' and officers' claims in November 1990 and of the FDIC's claim in December 1990. The directors and officers and the FDIC filed objections to the Deputy Liquidator's recommendations and pursued the appropriate actions (the "WMBIC actions") in the Wisconsin state court.

On August 16, 1991, the Wisconsin court issued a Decision and Order granting WMBIC's Motion for Summary Judgment. The court entered judgment in favor of WMBIC and dismissed plaintiffs' action on August 21, 1991. *See* CNA's Exh. B.

Plaintiffs' first claim for relief is for declaratory judgment. Specifically, plaintiffs contend that the MGIC Policy provides coverage for the claims and damages set forth in the Eugene FDIC action. Plaintiffs contend that notice of a claim was received by MGIC within the applicable time periods under the MGIC Policy. Plaintiffs assert that CNA is under an obligation to defend and indemnify the plaintiffs and to indemnify the FDIC in the Eugene FDIC action; including paying any

settlement or judgment arising from the Eugene FDIC action.

Plaintiffs' second claim is for breach of an insurance contract. Plaintiffs allege that CNA's failure and refusal to defend and indemnify the defendants and indemnify the FDIC in the Eugene FDIC action is a breach of express contractual obligations owed to plaintiffs by CNA under the MGIC Policy.

Plaintiffs' third claim alleges breach of a good faith obligation. When CNA assumed the MGIC Policy, among the obligations assumed was an implied obligation of good faith in favor of the plaintiffs. Plaintiffs allege that CNA breached that obligation.

Regarding damages, plaintiffs allege that CNA is obligated to defend and indemnify defendants and indemnify FDIC in the Eugene action and to pay any settlement or judgment arising from the Eugene FDIC action. Plaintiffs also allege they are entitled to damages in an amount to be proven at trial for CNA's alleged breach of contract and breach of implied obligation of good faith under the MGIC Policy. Plaintiffs also request attorney's fees and costs.

## STANDARDS

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

■ Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Electrical*, 809 F.2d at 630.

## SUMMARY JUDGMENT MOTIONS

CNA moves for summary judgment on five separate grounds as follows: (1) plaintiffs' claims are barred by collateral estoppel based on a judgment by a Wisconsin court against these plaintiffs on the issue in this case; (2) plaintiffs' claims are barred by the Regulatory Exclusion of the insurance policy at issue; (3) plaintiffs' claims are barred by the Insured v. Insured Exclusion of the policy at issue; (4) plaintiffs' claims are barred because no claim was made and no notice of a potential claim given during the Policy period; and (5) CNA did not issue the policy in question and is not responsible for the obligations thereunder.

I grant summary judgment for CNA and deny plaintiffs' summary judgment motion for the reasons that follow.

### 1. *Collateral Estoppel*

■ CNA argues that plaintiffs are barred from asserting this action by collateral estoppel because a Wisconsin state court entered judgment against plaintiffs on the same issues before this court. *See* CNA's exh. B(1) (Wisconsin court opinion). I agree. In granting WMBIC's summary judgment motion, the Wisconsin court held that the Policy does not provide coverage for FDIC's action against the directors and officers of the Bank because (1) the Regulatory Exclusion bars coverage for the FDIC's claims against the directors and officers; (2) the Insured v. Insured Exclu-

sion bars coverage for the FDIC's claims against the directors and officers; and (3) no claim had been made against the directors and officers and no timely notice of claim given during the Policy period.

In finding that collateral estoppel bars plaintiffs' claim, I rely on the Full Faith and Credit Statute which implements the Full Faith and Credit Clause of the U.S. Constitution. 28 U.S.C. § 1738. That statute provides that state court judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." *See Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgment emerged would do so").

■ Wisconsin has explicitly adopted the doctrine of non-mutual, defensive collateral estoppel. *Crowall v. Heritage Mut. Ins. Co.*, 118 Wis.2d 120, 346 N.W.2d 327, 330 (Wis.App.1984). A party may assert the doctrine of collateral estoppel in defense of a claim against him to prevent his adversary from relitigating an issue that was conclusively decided in a previous action. *Id.* The doctrine is available even if the party asserting it was not a party to the first action. *Id.* Therefore, even though CNA was not a party to the WMBIC action, CNA may assert the doctrine of collateral estoppel in defense of plaintiffs' claims against it.

■ The party raising the defense of collateral estoppel must demonstrate that the issue it seeks to foreclose was "litigated, determined, and necessary to the decision in the prior proceeding." *Reckner v. Reckner*, 105 Wis.2d 425, 314 N.W.2d 159, 165 (Wis.App.1981). The issues before this court are identical to the issues decided by the Wisconsin court. The Wisconsin court was construing the same Policy, issued to the same insureds, with the same terms and exclusions as the Policy before this court. The claims for which the insureds

seek coverage before this court are the same claims the insureds sought coverage for before the Wisconsin court. The three grounds relied on by the Wisconsin court to grant defendant's summary judgment motion are the same three grounds relied on here by CNA.

Further, I find that plaintiffs fully and actually litigated the issues before the Wisconsin court. The Wisconsin court decided the case on WMBIC's summary judgment motion. Plaintiffs opposed WMBIC's motion, fully briefed their opposition and orally argued the motion on July 19, 1991. Plaintiffs had every incentive and opportunity to vigorously litigate the issues before the Wisconsin court.

■ I reject the "alternative grounds" rule advanced by FDIC. Where a judgment rests on alternative grounds it is conclusive on all such grounds in a later action. *In re Westgate–California Corp.*, 642 F.2d 1174, 1176 (9th Cir.1981) ("even though the court rests its judgment upon two or more grounds, the judgment concludes each adjudicated issue that is necessary to support *any* of the grounds upon which the judgment is rested").

I also find that the issues relied on by CNA (whether the Regulatory and Insured v. Insured Exclusions bar coverage and whether a claim was made against the insureds or a notice of potential claim was given during the Policy period) were necessary to the Wisconsin court's judgment. The Wisconsin court expressly and conclusively decided each of these issues.

■ The Supreme Court has held that offensive, non-mutual collateral estoppel is *not* available against the government, but that defensive, mutual collateral estoppel is available. *United States v. Mendoza*, 464 U.S. 154, 162–63, 104 S.Ct. 568, 573–74, 78 L.Ed.2d 379 (1984); and *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 173, 104 S.Ct. 575, 580, 78 L.Ed.2d 388 (1984).

Mutuality exists when the parties in the two actions are the same. *Stauffer*, 464 U.S. at 171–72, 104 S.Ct. at 579 (government filed suit in different courts against the same party, Stauffer Chemical Compa-

ny. The court held that defensive collateral estoppel against the government was appropriate because mutuality of parties existed). In the Wisconsin proceeding, the FDIC and directors and officers filed proofs of claims in the Wisconsin Liquidation court for WMBIC Indemnity Corp. (formerly MGIC). In this case, FDIC and the directors and officers brought a declaratory action against CNA to determine coverage under the Policy. The two proceedings involve different opposing parties, the Liquidator for WMBIC Indemnity Corp. and CNA. Therefore, defensive collateral estoppel is unavailable against the FDIC.

■ However, even declining to apply collateral estoppel against the FDIC, CNA is still entitled to summary judgment against the directors and officers of the Bank. Summary judgment against those individuals necessarily requires summary judgment against FDIC because the FDIC's rights under the policy are derivative of the individual insureds' rights.

FDIC contends otherwise, arguing that the FDIC has its own independent standing in this case. FDIC contends that this "independent standing" to sue under the Policy exists because the Policy provides coverage to the Bank in the event the Bank is required to indemnify the directors and officers. This argument is subject to the other terms of the Policy. Therefore, the same provisions that the Wisconsin Court found to bar coverage for the directors and officers also bars coverage for the FDIC.

I also fail to find any factual basis for FDIC's suggestion that it might indemnify the directors and officers here. Article X of the Bank's Articles of Incorporation prohibits indemnification if a director or officer is "finally adjudged ... to be liable for negligence or misconduct in the performance of duty to the corporation." CNA's Exh. W. Further, even if the Bank's Articles of Incorporation permitted it to indemnify the directors and officers, there is no factual basis upon which to conclude that the FDIC ever would do so. FDIC asserts that it would indemnify the directors and officers for a judgment entered against them in a case *brought by* the FDIC and

premised upon the directors' and officers' mismanagement and unsafe and unsound banking practices. Further, FDIC has not made any showing that, upon its appointment as receiver, it actually assumed any liability to indemnify the directors and officers for personal liabilities arising out of their mismanagement.

SUMMARY: COLLATERAL ESTOPPEL

Collateral estoppel acts to bar individual plaintiffs' claims against CNA. Collateral estoppel is not available against the U.S. Government (FDIC) in the absence of mutuality, which does not exist here. Nevertheless, because FDIC's rights are derivative of, and no greater than, the rights assumed by FDIC from the Bank, collateral estoppel may also be derivatively applied to bar FDIC's claims against CNA.

### 2. *Regulatory Exclusion*

The Regulatory Exclusion provides as follows:

> It is understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers based upon or attributable to any claim, action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation....

■ The plain language of the policy clearly excludes from coverage losses incurred in connection with any action or proceeding brought by the FDIC. The plain language of the policy does *not* mean that only derivative or secondary claims resulting from actions brought by the FDIC are barred. This argument was advanced by plaintiffs in the Wisconsin case and rejected by that court. Concluding that the Regulatory Exclusion bars coverage only for secondary suits would require the court to ignore the unambiguous terms of the Policy.

Ten courts have recently considered this issue. Nine of ten have held that the Exclusion is unambiguous and that it bars coverage for actions brought by the FDIC. *See American Casualty Co. v. Baker,* 758 F.Supp. 1340, 1347 (C.D.Cal.1991) ("there is

no ambiguity to the language of the [Regulatory Exclusion] clause and the RTC/FDIC's submissions do not make it so. Only the 'secondary suit' limitation, offered by the RTC/FDIC, creates strain on the contractual provision in issue"). *See also, Gary v. American Casualty Co.,* 753 F.Supp. 1547, 1551 (W.D.Okla.1990) (Regulatory Exclusion clearly bars coverage for "any loss resulting from any action brought by or on behalf of the FDIC in any capacity against a bank director or officer").

The Eighth Circuit is the first federal appellate court to address the enforceability of the Regulatory Exclusion. *American Casualty Co. v. FDIC,* 944 F.2d 455 (8th Cir.1991). The court held that all claims by the FDIC were barred by the Regulatory Exclusion and that the Exclusion was neither ambiguous nor contrary to public policy. The court stated that the district court's holding that the Regulatory Exclusion was valid was "in line with the vast majority of courts which have considered this exclusion" and that "[n]o good purpose would be served by repeating those discussions." *Id.* at 460–61. *American Casualty* follows a long line of state and federal court decisions upholding the exclusion.

Only two courts have held to the contrary and both based their holdings upon a early decision out of Iowa that was subsequently reversed. In *American Casualty Co. v. FDIC,* No. 86–4018, 1990 WL 66505 (N.D.Iowa Feb. 26, 1990) (1990 U.S. Dist. LEXIS 6065), *appeal pending,* the court reversed its previous holding that the Regulatory Exclusion was ambiguous. Instead, the court concluded that the Regulatory Exclusion "clearly excludes claims by the FDIC and is not ambiguous."

CNA maintains that the Regulatory Exclusion is not void as contrary to public policy (another argument attempted by plaintiffs in Wisconsin and rejected by that court). The Supreme Court requires a finding that a public policy is "explicit," "well defined," and "dominant" as a prerequisite to voiding a contract as contrary to that policy. *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct.

2177, 2183, 76 L.Ed.2d 298 (1983). Courts ascertain whether a purported public policy is explicit, well defined, and dominant by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945).

Neither the statutory nor the regulatory scheme governing the FDIC establishes an explicit, well defined, and dominant public policy regarding the Regulatory Exclusion. Neither Congress nor any federal regulatory agency has prohibited financial institutions from purchasing directors and officers liability insurance policies that contain a Regulatory Exclusion. Congress and the federal regulatory agencies do not even require that financial institutions purchase directors and officers liability insurance.

Further, Congress expressly exempted directors' and officers' liability insurance policies from the FDIC's power to override contract provisions. Congress amended 12 U.S.C. § 1821(e)(12)(A) to include the following provision: "[t]he conservator or receiver may enforce any contract, other than a directors' or officers' liability insurance contract or a depository institution bond, entered into by the depository institution. . . ."

The majority of courts examining this issue have concluded that there is not a public policy to justify invalidating a contract on those grounds. *See Baker,* 758 F.Supp. at 1347 ("[i]t seems illogical to conclude that enforcement of the regulatory exclusion would violate public policy in the face of a congressional enactment which provides for the receiver's enforcement of any contract, except a directors' or officers' liability insurance contract. . . ."); *Gary,* 753 F.Supp. at 1553 (if Regulatory Exclusion violates public policy then failure to obtain directors and officers liability insurance would also, yet no policy requires that a bank obtain or maintain such insurance); *Continental Casualty Co. v. Allen,* 710 F.Supp. 1088, 1099 (N.D.Tex.1989) ("directors' and officers' liability insurance is optional under all the rules and regulations promulgated by the various regulatory

agencies of the Bank. Thus, polices providing limited insurance, which are not required by statute or mandated as to form of coverage, are not invalidated on a public policy argument").

FDIC responds by citing the few cases that have found the regulatory exclusions to be void as against public policy. *See Branning v. CNA Ins. Co.*, 721 F.Supp. 1180, 1184 (W.D.Wash.1989) ("the clause substantially hinders FSLIC's exercise of its federal powers and therefore is contrary to federal policy...."); *FDIC as Receiver for Buena Vista Bank & Trust v. Bowen*, No. 88 CV 16746 (Dist.Ct., City and County of Denver, Colo., Nov. 17, 1989) ("regulatory exclusion is unenforceable because it impairs the federal and state statutorily imposed duties of FDIC/Receiver").

The authority relied upon by FDIC is weak. *Bowen* was reversed on appeal. *FDIC v. Bowen*, 824 P.2d 41 (Colo.Ct.App. 1991). *Branning* was criticized and rejected by recent decisions. *See Continental Casualty Co. v. Allen, supra;* and *FDIC v. Zaborac*, 773 F.Supp. 137, 146 (C.D.Ill.1991) ("this Court does not believe that it should invalidate an exclusion where there is no clear public policy interest ...") (CNA's exh. V–2). *American Casualty* states, "to invalid[ate] its exclusions in this case on grounds of public policy would be tantamount to performing what is properly a legislative function."

## SUMMARY: REGULATORY EXCLUSION

I grant CNA's summary judgment motion on this ground, independent of my finding above on collateral estoppel. I find that the Exclusion bars claims by the FDIC and is not ambiguous or against public policy as held by the Eighth Circuit in *American Casualty.*

### 3. *No Claim and No Notice During Policy Period*

CNA also asserts that plaintiffs failed to file a claim or provide defendant with notice of any potential claims during the policy period. The Policy at issue is a "claims-made" policy which means that the company agrees to assume liability for acts or omissions as long as the claim against the insured arising out of these acts or omissions is made during the policy period. (Contrary to an "occurrence" policy which provides coverage for acts or omissions occurring during the policy period even though the claim is made after the policy has expired). The Policy also allows the insureds to give specific, written notice of potential claims of which they become aware during the Policy period. If the insureds give such notice during the Policy period, a claim made after the Policy period based on the specific Wrongful Acts reported during the Policy period is treated as a claim made during the Policy period and thus as potentially covered.

Courts typically enforce the notice requirements in claims-made policies strictly because the notice provision

> serves a materially different purpose from one in an occurrence policy. The notice provision of a claims-made policy is just as important as the requirement that the claim be asserted during the policy period. If the insured does not give notice within the contractually required time period ... there is simply no coverage under the policy.

*City of Harrisburg v. International Surplus Lines Ins. Co.*, 596 F.Supp. 954, 961 (M.D.Pa.1984), *aff'd*, 770 F.2d 1067 (3d Cir. 1985).

Applying the principles discussed above, the Policy affords no coverage here, as the Wisconsin court found.

## A. CEASE AND DESIST ORDER NOT A CLAIM MADE DURING THE POLICY PERIOD

█ It is undisputed that a lawsuit was not filed until August 1987, after the Policy had expired. CNA argues that the Cease and Desist Order was not a claim made against the directors and officers during the Policy period. The Ninth Circuit has held that regulatory directives requiring compliance with banking laws and regulations, but falling short of holding the insureds personally liable for the misconduct or seeking money damages from them, do *not* constitute a "claim" made against the

insureds. *California Union Ins. Co. v. American Diversified Sav. Bank,* 914 F.2d 1271, 1276–77 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991); *see also, Burns v. International Ins. Co.,* 709 F.Supp. 187, 189 (N.D.Cal.1989), *aff'd,* 929 F.2d 1422 (9th Cir.1991).

Here, as in *California Union* and *Burns,* the Cease and Desist Order may have required compliance with banking regulations, but it fell short of holding the directors and officers personally liable for the misconduct or seeking money damages from them. The insureds themselves recognized that the Order was not a claim as they stated that no claim had been asserted in their December 1982 Proposal. *See* CNA's Exh. D, p. 2.

### B. NO NOTICE OF POTENTIAL CLAIM WAS GIVEN DURING POLICY PERIOD

■ The insureds first gave notice of a potential FDIC claim against them in October 1984, when they sent MGIC and CNA a letter from the FDIC which contained allegations of Wrongful Acts by the Directors and Officers. CNA argues that because these notices were forwarded to MGIC and CNA *after* the Policy period expired, those notices provide no coverage. The notice requirements contained in the Policy require that the insureds themselves become aware of an intention to hold the directors and officers responsible for a "Wrongful Act." The insureds clearly stated that they were unaware of any occurrence that could subsequently give rise to a claim against them. *See* CNA's Exh. D, p. 2 (Bank's Policy renewal application). The renewal application asks: "[h]as there been during the last 5 years, or is there now pending, any claim against any person proposed for this insurance in their capacity as either Director, Officer or employee of this Holding Company or its Subsidiaries?" and "[d]oes any Director or Officer have knowledge or information of any act, error or omission which might give rise to a claim under the proposed policy?" To both questions, the insureds responded, "no." *Id.*

The insureds explain their response to question # 17 on the renewal form with an attached 1½ typewritten page. Question # 17 asks: "[h]as this Holding Company or Subsidiary ever received a Cease and Desist Order from any regulatory agency?" Insureds respond at length outlining the "affirmative action" to be taken by the Bank as ordered by the FDIC in its Oct. 7, 1982 Cease and Desist Order. The insureds' concluding paragraph states:

> We believe that the Order was predicated mainly upon the deterioration of the Bank's loan portfolio, due primarily to the depressed state of the economy. Management has taken the steps necessary to strengthen the condition of the Bank, and the results reflect significant improvement. Management and the Directorate continue to closely monitor the Bank's progress, and anticipate further improvement in the future.

CNA's Exh. D, p. 8–9.

In every one of the individual plaintiffs' depositions, they testified that, at no time prior to 1984 (*after* expiration of the Policy), did they believe that there was a significant likelihood of claims being asserted against them. The depositions support the fact that the Cease and Desist Order was mentioned because the Proposal forms asked whether any such order had been entered, not because any director or officer feared claims by the FDIC. When the directors and officers did later become aware of a potential claim, they knew to write to MGIC informing it that FDIC was threatening to hold them responsible for a Wrongful Act. *See* CNA's Exh. C(1) (affidavit of Sherry Anderson, CNA's Manager of Professional Liability Claims with attached letters she received from the Bank's directors and officers in Oct. 1984 notifying CNA of the FDIC's claims against them).

FDIC asserts that the issue is whether MGIC received notice of "occurrences" which subsequently gave rise to the claims in the FDIC action. FDIC relies on the affidavit of Lisa Byrnes, the MGIC underwriter who reviewed and denied the Holding Corp. and Renewal Applications. *See* FDIC's Exh. C. Byrnes stated that she

perceived that future claims against the individual plaintiffs were likely based upon occurrences at the Bank. These occurrences included issuance of the Cease and Desist Order indicating that the Bank's management was unacceptable to the Bank's regulators, that the Bank's financial condition was extremely weak and that the Bank risked financial failure. *Id.*

The Ninth Circuit held in *California Union* that standard bank financial information submitted on a renewal application does *not* constitute notice of potential claim, even when the information suggests the bank has financial difficulties and regulatory problems. *California Union*, 914 F.2d at 1277–78. In *California Union*, the court construed a notice provision similar to the provision involved here. The court rejected a "constructive" notice theory identical to that asserted by plaintiffs and affirmed summary judgment for the insurer. The court held that the appropriate inquiry is whether the written material submitted by the insureds was designed to and did in fact give notice of an occurrence that might give rise to a claim against the directors and officers. *Id.* at 1278.

Specifically, in *California Union*, the Bank received a cease and desist order from the California Dept. of Savings and Loan and entered into a supervisory agreement with the FSLIC. As here, the insureds did not provide either the cease and desist order or the supervisory agreement to the insurer. However, they contended that the insurer had "constructive" notice of a potential claim from documents which should have alerted the insurer to the institution's regulatory problems. *Id.* at 1277–78. The court explicitly rejected the "constructive notice" theory and held that the documents submitted to the insurer "would not have alerted [the insurer] to anything [the insured] considered to be a potential claim." *Id.* The court held that such notice must be designed to give notice of a potential claim and must *actually do so.* *Id.*

FDIC attempts to distinguish *California Union* by arguing that the insureds did not notify the insurance company in any way

of the regulatory proceedings and criticisms during the policy period. Here, however, MGIC's receipt of the information in the Holding Corp. and Renewal Applications create an issue of fact as to whether MGIC had notice of potential claims against the directors and officers.

A difference must be noted between the issues of whether MGIC was *aware of occurrences* which subsequently gave rise to the Wisconsin lawsuit, and whether the directors and officers of the Bank gave notice in compliance with paragraph 6(A) of the Policy. I find that there is a substantial difference between an insurer being on notice that an insured is a poor risk for future insurance, and its having received the specific notice required under Policy paragraph 6(A).

I rely on the Eighth Circuit's recent decision in *American Casualty*, where the insurer had been notified that a cease and desist order had been issued against the bank, that classified assets were 200% of capital, and that the bank expected to lose over $400,000. Further, the court found that during the renewal process the bank's troubles with its loan portfolio were fully revealed. *Id.* at 460 (CNA's exh. V–1). The court held that these facts did *not* constitute notice under paragraph 6(A). *Id.* at 460–461.

Very similar facts exist here, except that plaintiffs did not provide as much information to the Bank as was provided by the plaintiffs in *American Casualty*. The court in *American Casualty* noted that throughout this process, the insured told the insurer the bank was not in danger, just as the Bank did in the case at bar (as evidenced by the renewal applications the Bank filled out).

*American Casualty* relied on the Ninth Circuit's decision in *California Union*. In *California Union*, the court rejected the insured's contention that the subjective awareness of the insurer was relevant to determining whether notice of a potential claim was given. Rather, the court held that the issue was whether the insured had provided written notice of matters that the

**1354**

insured considered to be a potential claim. *California Union*, 914 F.2d at 1278.

Paragraph 6(A)(ii) of the Policy expressly requires that the insured (1) become aware of an occurrence during the Policy period that may give rise to claims; and (2) give specific written notice thereof to the insurer. Neither requirement was satisfied here. Plaintiffs' deposition testimony demonstrated that none of the directors or officers ever believed that claims were a significant possibility until the Bank failed. Plaintiffs have not controverted this fact.

In *American Casualty Co. v. Wilkinson*, CV–89–1609–W, 1990 WL 302175 (W.D.Okla. Dec. 21, 1990) (CNA's Exh. U8), the court construed a notice provision identical to the one here and found that no proper notice had been given on facts far more favorable to the insureds than those present here. In *Wilkinson*, the insured received, among other things, a letter stating that the financial institution had been advised of a potential claim against the institution and its directors and officers by 50 borrowers specifically identified in the letter. The court rejected FDIC's argument that the listing of 50 loans, even with the express comment that such loans might give rise to a claim, constitutes notice. Slip op., at p. 9 (CNA's Exh. U8).

The renewal applications submitted by the Bank fall short of the requirements in *California Union* and *Wilkinson*. The applications describe "corporate" acts or financial circumstances of the Bank, but provide no information on specific Wrongful Acts of specific Directors and Officers. The documents contain no "identification of the alleged Wrongful Act" (if any), and no indication that the directors and officers had become aware that such acts might give rise to a claim by the FDIC for negligence or breach of fiduciary duty. *See Wilkinson*, slip op. at 9–10.

SUMMARY: NO VALID NOTICE UNDER PARAGRAPH 6(A)

Relying on *California Union* and *American Casualty*, CNA has demonstrated that there is no material issue of fact that plaintiffs failed to comply with the notice requirements under the Policy pursuant to

para. 6(A). The issue is not whether the insured was aware of occurrences, but whether plaintiffs provided the proper notice.

CONCLUSION

CNA's summary judgment motion is granted. Collateral estoppel bars individual plaintiffs from relitigating the issues decided by the Wisconsin court. Collateral estoppel does not bar FDIC's claim against CNA directly, but because FDIC's rights under the policy are derivative of the individual insureds' rights, FDIC's claims against CNA are also barred.

Even if I did not grant CNA's summary judgment on the basis of collateral estoppel, I find that plaintiffs' claims are barred by the Regulatory Exclusion and therefore grant CNA's motion on this separate and distinct ground. The Exclusion is clear and unambiguous and does not violate public policy.

In addition, I grant CNA's summary judgment motion on a third distinct ground. I find that plaintiffs failed to provide CNA with any notice of potential claims during the Policy Period.

This action is dismissed.