**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver and liquidator for First State Bank, Blanchard, Oklahoma, and in its corporate capacity; John Hudson; Janet Hudson; Randall Hill; Jack Marshall; Alford L. Robertson, and Jack B. Rackley, Defendants.**

No. CIV–91–1583–C.

United States District Court, W.D. Oklahoma.

Feb. 26, 1993.

Order Denying Motion for Reconsideration or to Alter or Amend Judgment May 12, 1993.

John R. Couch, Pierce Couch Hendrickson Johnston and Baysinger, Oklahoma City, OK, Sean M. Hanifin and David L. Perry, Ross Dixon & Masback, Washington, DC, for plaintiff.

Donna Nix Blakley, Kirk D. Fredrickson and Jon Epstein, Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, OK, for FDIC.

C. Merle Gile, Oklahoma City, OK, for Rackley.

## MEMORANDUM OPINION AND ORDER

CAUTHRON, District Judge.

### I. INTRODUCTION

Before the Court is plaintiff American Casualty Company's ("American") motion for partial summary judgment filed March 3, 1992. Defendant FDIC responded in opposition on July 17, 1992. American replied on July 30, 1992. On August 14, 1992, FDIC filed a cross-motion for partial summary

judgment. American responded on September 11, 1992. FDIC filed a reply on September 29, 1992, and American filed a surreply on October 15, 1992. This case involves a most difficult question of coverage under a policy of bank directors' and officers' liability insurance.

In the interest of judicial economy and at the request of the parties a separate, potentially dispositive issue regarding the "Insured vs. Insured" exclusion provision in the director and officers' liability insurance policy was severed for prior consideration and the current matter was stayed until resolution of the exclusion issue. The Court denied partial summary judgment to American on that issue on April 17, 1992, which was asserted in Count III of the Complaint. *American Cas. Co. v. FDIC*, 791 F.Supp. 276 (W.D.Okla.1992). The remaining issue in American's motion is whether American is entitled to judgment on Counts I, II, and IV of its Complaint.

## II. STANDARD FOR SUMMARY JUDGMENT

■ Facts presented to the Court upon a motion for summary judgment must be construed in a light most favorable to the nonmoving party. *Board of Educ. v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam). If there can be but one reasonable conclusion as to the material facts, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Only genuine disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. at 2510. Finally, the movant must show entitlement to judgment as a matter of law. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985); Fed.R.Civ.P. 56(c).

■ Although the Court must view the facts and inferences drawn from the record in a light most favorable to the nonmoving party, "even under this standard there are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chem. Co.*, 849 F.2d 1269, 1273 (10th Cir.1988). As stated by the Supreme Court, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

■ The Supreme Court articulated the standard to be used in summary judgment cases, emphasizing the "requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis in original). A dispute is "genuine" "if a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court stated that the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252, 106 S.Ct. at 2512. An appellate court in reviewing a grant of summary judgment is "'not limited to the grounds upon which the trial court relied but may base summary judgment on any proper grounds found in the record to permit conclusions of law.'" *Awbrey v. Pennzoil Co.*, 961 F.2d 928, 930 (10th Cir.1992) (quoting *City of Chanute, Kan. v. Williams Natural Gas Co.*, 955 F.2d 641, 647 (10th Cir.1992) (citing *United States v. Colorado*, 872 F.2d 338, 339 (10th Cir. 1989))).

## III. UNDISPUTED FACTS

Rule 14(B) of the Western District of Oklahoma provides a framework for determining undisputed facts at the summary judgment stage. A review of American's brief at 7–18 (Mar. 3, 1992), and FDIC's response brief at 2–8 (July 17, 1992) reveals that the following

facts are undisputed within the meaning of Rule 14(B):

### A. The Individual Defendants' Acquisition of the Bank and Procurement of the Policy

1. In 1980, defendant John Hudson first acquired an ownership interest in the First State Bank of Blanchard, Oklahoma ("bank"). In early 1982, Hudson bought out his partner's interest in the bank, thereby becoming the owner of 97% of the outstanding shares of the bank's stock. Shortly thereafter, Hudson installed most of the remaining individual defendants in positions of authority at the bank. Defendant Randall Hill was appointed the bank's president in January 1982. Defendant Jack Marshall (Hudson's father-in-law) became the chairman of the bank's board of directors in September 1982. Hudson's wife, defendant Janet Hudson, became a member of the bank's board of directors in early 1983. According to the FDIC, at the time Hudson, his family, and his associates took control of the bank, the bank was in generally sound financial condition.

2. On October 15, 1983, defendant FDIC examined the bank for the first time since it was acquired by Hudson. At that time, the examiners reportedly noted a substantial deterioration in the bank's loan quality. According to the FDIC, the bank's directors and officers were advised of the significant decline in the quality of the bank's portfolio and were warned, among other matters, of an increase in the number and severity of violations of banking laws and regulations.

3. In their liability insurance renewal application, the individual defendants did not advise MGIC Indemnity Corporation ("MGIC") of the admonitions by the FDIC. The directors and officers answered "No" to one of the questions on the renewal application that asked whether any of the bank's directors or officers had been alerted to any significant violations of laws and regulations.

4. On December 20, 1983, based on the information provided by the bank's directors and officers, MGIC renewed the ·policy, which was subsequently assigned to American. The policy is a "claims-made" policy, that is, subject to all of its terms, conditions and endorsements, it provides coverage for claims made against the insured directors and officers within the policy period.

5. Alternatively, under ¶ 6(a) of the policy, if, during the policy period, an insured becomes aware of an occurrence which may subsequently give rise to a claim against the directors and officers for a wrongful act, and if the insured gives written notice to the insurer in compliance with the provisions of ¶ 6, claims made against the directors and officers thereafter based on the same wrongful act will be treated as having been made during the policy period.

6. For any claim made during the policy period, the bank or its directors and officers are required by ¶ 6(b) of the policy, as a condition precedent to their rights under the policy, to give written notice of the claim as soon as practicable. Notices under both ¶¶ 6(a) and (b) are required to be sent to the Manager, Professional Liability Claims, CNA Insurance, Chicago, Illinois 60685.

### B. The Deterioration of the Bank

7. In May 1984, the FDIC again examined the bank. This time, the regulators discovered that the bank's problem loans constituted approximately 71% of the bank's capital. However, no claim was made against the bank's directors and officers, and American was not advised of any potential claim attributable to the decline in the bank's financial condition.

8. Based on the results of the May 1984 examination, the FDIC requested that the bank's board of directors enter into a Memorandum of Understanding with state and federal regulators in order to define certain "management goals" intended to improve the bank's condition. Again, however, no claim was made against the bank's directors and officers. Moreover, American was not apprised of the fact that the regulators had proposed a Memorandum of Understanding.

9. On October 22, 1984, the bank's board of directors signed the Memorandum of Understanding proposed by the FDIC. Once again, however, no claim was made against the bank's directors. American was still not advised of the existence of the Memorandum

of Understanding, which had been signed by the bank's directors.

10. In March 1986, state and federal regulators again examined the bank. Despite the regulators' past recommendations and admonitions (none of which had been reported to American), the examination revealed that the bank's lending practices continued to be unsafe and unsound. The regulators still failed to make a claim against the bank's directors and officers.

11. On August 8, 1986, defendant John Hudson resigned from the bank's board of directors, apparently as a result of pressure from the regulators that he do so. Nevertheless, no claim was then made against Hudson (or any other director or officer of the bank).

### C. *American's Decision Not to Renew the Policy*

12. All coverage under the policy was due to expire at the conclusion of the policy period—December 20, 1986. Thus, on October 28, 1986, defendants Hill and Robertson completed an application to renew the coverage provided by the policy. On November 13, 1986, American advised the bank that it was unwilling to offer the bank renewal terms and conditions.

13. Although the bank and its directors and officers had been criticized and reprimanded for failing to comply with various regulatory requirements, American was never informed of any of these criticisms or reprimands, or of the possibility of future claims based upon such criticisms or reprimands.

### D. *The Directors' and Officers' Decision To Purchase "Discovery Clause" Coverage*

14. On December 24, 1986, the bank's directors and officers elected to exercise their option to purchase the limited "discovery clause" coverage available pursuant to policy ¶ 2(b):

If the Insurer shall cancel or refuse to renew the policy, the Bank shall have the right, upon payment of fifty percent (50%) of the Annual premium or twenty percent (20%) of the three year prepaid premium set forth in Item 5 of the Declarations, to an extension of the coverage granted by this policy with respect to any claim or claims which shall be made against the Directors or Officers during the period of twelve calendar months after the date of such cancellation or refusal to renew, but only with respect to any Wrongful Act committed before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the appropriate premium must be made within ten (10) days after the effective date of cancellation or non-renewal of the policy.

15. As noted above, at the time American refused to renew the policy and the directors and officers elected to purchase the limited coverage available pursuant to the policy's discovery clause, no claim had been made against them. Thus, subject to all of the policy's terms, conditions and endorsements, the discovery clause coverage purchased by the bank's directors and officers provided coverage only for any claim or claims actually made during the period that the limited coverage remained in effect.

### E. *The Failure of the Bank*

16. In March 1987, the state and federal regulators once again examined the bank. Conditions at the bank had continued to deteriorate. During the examination, the regulators discovered, among other things, that additional loans totalling approximately $200,000 were made to Hudson since the date of the last examination. These loans allegedly were made despite the fact that Hudson also had been permitted to continue to renew a $240,000 note with the bank without making any payments to reduce the principal due on that note. The regulators also learned that the bank's problem loans had grown to $6.3 million—an amount equal to nearly 410% of the bank's capital. Still, no claim was made against Hudson or any of the bank's directors or officers.

17. Eventually, the regulators prepared an accounting of the bank's financial condition and, not surprisingly, concluded that the bank was insolvent. Thus, on August 13, 1987, the Banking Commissioner of the State of Oklahoma ordered the bank closed and

took possession and control of the bank's assets. That same day, the FDIC accepted appointment by the Banking Commissioner as liquidator of the bank. A claim still had not been made against any of the bank's directors or officers.

### F. The Termination of All Coverage Under the Policy

18. Endorsement No. 7 provides for the termination of all coverage under the policy, including termination of the limited coverage provided pursuant to the policy's discovery clause, immediately upon the appointment of a liquidator for the bank. Specifically, the policy's Reorganization/Cessation of Business Endorsement provides, in pertinent part, that:

> if the Bank has ceased to engage in an active banking business or to accept deposits, coverage shall cease as of the date of the . . . cessation of such business, and the Bank shall not be entitled to obtain the extended coverage provided for in Clause 2(b). For the purposes of this clause, the cessation of the business of banking shall include, but not be limited to, the appointment by any federal or state banking regulators of a receiver, liquidator or person in a similar capacity.

Thus, as of August 13, 1987—the date the FDIC was appointed as liquidator of the bank—*all* coverage under the policy ceased. As noted above, as of that date, no claim had been made against any director or officer of the bank.

19. It was not until August 4, 1988—the day *FDIC v. Hudson*, No. CJ–88–8115 (Okla.County Dist.Ct.1988) was filed—that a claim was made against any of the bank's former directors and/or officers. Thus, the claim was made more than 19 months after the expiration of the full coverage afforded by the policy, and nearly one year after all coverage ceased pursuant to policy Endorsement No. 7. The claim was not made for 227 days after the limited discovery clause coverage was scheduled to expire by its own terms.

20. On August 20, 1987, Robert A. Patrick, an attorney for the FDIC, sent a form letter to J. Ruth Sottong (who was incorrectly addressed as an employee of CNA Insurance Company). The form letter, which was sent one week *after* all coverage under the policy expired pursuant to Endorsement No. 7, confirms that the bank was closed on August 13, 1987, but is silent as to any claims or potential claims.

21. On November 6, 1987, Patrick sent a second form letter to American. This form letter, which was sent nearly three months after all coverage under the policy expired pursuant to Endorsement No. 7, does not reflect any information specific to the bank.

## IV. ANALYSIS

American contends that partial summary judgment is proper because no insurance claim was properly made during the policy period of the pertinent policies of the directors' and officers' liability insurance, no notice of potential claims was given during that policy period, and also because no claim was made during the period for which the limited "discovery clause" coverage was provided. American contends that coverage of the entire insurance policy terminated pursuant to the policy when FDIC was appointed liquidator on August 13, 1987. The Court agrees with American on each of these theories as more fully set forth below.

### A. Reorganization/Cessation of Business Clause.

Regulators closed the bank on August 13, 1987. Endorsement No. 7 provides that liability coverage terminates in this event:

> if the Bank has ceased to engage in an active banking business or to accept deposits, *coverage shall cease as of the date of the . . . cessation of such business, and* the Bank shall not be entitled to obtain the extended coverage provided for in Clause 2(b). For the purposes of this Clause, the *cessation of the business of banking shall include*, but not be limited to, *the appointment* by any federal or state banking regulators *of a* receiver, *liquidator*, or person in a similar capacity.

FDIC's brief at ex. 3, p. 11 (unnumbered) (July 17, 1992) (emphasis supplied). Because no claim had been properly filed prior to the time the bank was closed on August 13, 1987

when FDIC was appointed liquidator, then any subsequent claims were ineffective.

Even if this was not so, the discovery period terminated by its own terms independently of the cessation of business clause on December 20, 1987, and the Court finds that FDIC did not file any claim until August 4, 1988, when the petition in *FDIC v. Hudson,* No. CJ–88–8115 (Okla.County Dist.Ct.1988) was filed.

■ FDIC argues that the endorsement only means that initial insurance will be terminated, and the plain language of the endorsement only says that discovery insurance will not be able to be obtained. Therefore, reasons FDIC, if the discovery insurance has already been obtained, then Endorsement No. 7 has no effect. The Court does not give Endorsement No. 7 such a restrictive reading. It clearly and unambiguously reads that coverage shall cease, which broadly includes coverage by any discovery insurance already in effect. The fact that the bank is expressly disentitled to obtain discovery period insurance only strengthens this conclusion. Also, because the cessation of business clause and the disentitlement to discovery insurance clause are joined by the conjunctive "and," then these two clauses are mutually exclusive. Thus, the Court rejects FDIC's argument that coverage does not cease if discovery insurance has already been obtained.

The Court also rejects FDIC's argument in this regard that the contract is susceptible to two interpretations, and thus ambiguous, and therefore should be construed in favor of coverage. FDIC submits that John Whelan, a former senior insurance underwriter, testified that he did not believe that the endorsement affected the discovery coverage in this case, which was already obtained prior to the bank's closing. However, Whelan qualified his answer with the statement that the question "would be really under the purview of the claims department." *See* FDIC's response brief at ex. 18, p. 96 (July 17, 1992).

■ In any event the Court finds from looking at the plain language of the policy that the express intent is unambiguous. "Only in the event of ambiguity does a court resort to extrinsic evidence[ ]" in order to interpret a contract. *Isaac v. Temex Energy, Inc. (In re Amarex, Inc.),* 853 F.2d 1526, 1530 (10th Cir.1988); 15 Okla.Stat. § 155 (as a general rule the intention of the parties is to be obtained from the writing alone if possible). FDIC also argues that the unused discovery period premium was not returned, which evidences American's own belief that the policy was in effect. While it appears to be error for American to have failed to refund the unused premium, such a fact appears to be more indicative of inattention rather than intention, and does not sway this Court's conclusion in any event. This Court will not need to rely on any extrinsic evidence.

■■ FDIC would have the Court look at documents and testimony to determine that the policy is ambiguous, but that is not the proper order of inquiry. If the Court can make a reasonable determination that the document is unambiguous, then the inquiry ends. In that event extrinsic evidence, no matter how otherwise persuasive, is unavailing. American also contends that a document now proffered by FDIC that arguably interprets the coverage clause was summarily rejected by the Tenth Circuit in FDIC's petition for rehearing en banc in *American Cas. Co. v. FDIC,* 958 F.2d 324 (10th Cir. 1992). "Under Oklahoma law related to insurance contracts, '[t]he terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intentions of the parties as it existed at the time of the contract.'" *Id.* at 326 (quoting *Dodson v. St. Paul Ins. Co.,* 812 P.2d 372, 376 (Okla.1991)).

■ The discovery period is just that—a time to investigate wrongful conduct that may have occurred while the coverage was in force. But even so, during the discovery period American needs notice of an actual claim of misconduct that occurred during the policy period. And, the discovery period is only effective during such time that the Reorganization/Cessation of Business endorsement remains dormant. When that endorsement was activated on August 13, 1987, then all coverage, including the discovery period coverage, terminated. During the discovery

period only notices of actual claims are effective, not notices of occurrences or potential claims. *See American Cas. Co. v. FDIC*, 958 F.2d 324, 326–28 (10th Cir.1992), *declining to follow on indistinguishable facts McCuen v. American Cas. Co.*, 946 F.2d 1401, 1405–06 (8th Cir.1991) (finding coverage from notice of occurrences during the discovery period and further finding ambiguities to be construed in favor of insurance coverage).

Endorsement No. 3 in relevant part reads: "If the extended discovery period option is exercised in accordance with Clause 2(b) of the Policy, such extension of coverage shall be part of and not in addition to the last Policy Year." FDIC's brief at ex. 3, p. 7 (unnumbered) (July 17, 1992). FDIC argues that this clause should be interpreted to mean that the extended discovery period should be treated no differently than the rest of the period covered under the Policy and therefore notices of potential claims can be made during the discovery period. *See American Cas. Co. v. Continisio*, Civil Action Nos. 91–5107 & 92–1720 (D.N.J. Sept. 11, 1992); *accord American Cas. Co. v. FDIC*, 822 F.Supp. 1525 (W.D.Okla.1992). The Court rejects this interpretation because Endorsement No. 3 expressly limits discovery period liability, which only means that limits of liability cannot be increased during the discovery period. Moreover, that clause uses the term "policy year," which is not to be confused with the term "policy period." Policy year does not apply to notice. This Court declines to follow FDIC's authorities on this matter. Genuine ambiguities exist only in the event of doubtful language susceptible to two constructions and should not be raised by taking contract provisions out of context. *See FDIC v. American Cas. Co.*, 975 F.2d 677, 679–80 (10th Cir.1992).

■ Moreover, the letters sent to American after the bank was closed are inadequate notices of potential claims because they do not cite any specific wrongful acts as required by the policy. The November 6, 1987, letter is simply a boilerplate form letter that includes a laundry list of potential wrongdoing that could be committed by any bank director or officer, and does not contain any

requisite specificity as to the particular bank. American argues, and FDIC does not deny, that these form letters were routinely sent by FDIC during the 1980's every time it took over a bank's assets in order to attempt to preserve insurance coverage. American has proffered twelve virtually identical letters sent to various institutions. American's reply brief at ex. 10 (July 30, 1992).

■ The information provided is also both over-inclusive in part as to naming individuals who were later not sued, and under-inclusive in omitting a certain individual who was sued. The Court finds that an insurance company could not adequately rely on such notice in order to protect its rights. The information did not adequately apprise the insurer of the need to investigate and determine the extent of potential liability of the insurer's fund in order to distribute appropriate annual dividends to shareholders and determine the actuarial basis upon which premiums are calculated. *See Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 324, 495 A.2d 395, 406 (1985); *Heikkinen v. Aetna Cas. & Sur. Co.*, 124 Mich.App. 459, 464, 335 N.W.2d 3, 5 (1981).

■ American even notified FDIC that the letters were inadequately nonspecific and FDIC failed to respond. Coverage under a claims-made policy is only triggered by adequate notice. *City of Harrisburg v. International Surplus Lines Ins. Co.*, 596 F.Supp. 954, 961 (M.D.Pa.1984), *aff'd without op.*, 770 F.2d 1067 (Table) (3d Cir.1985). The attempted notice is woefully inadequate because there is no identity of borrowers nor specific loans that would eventually comprise damages in *FDIC v. Hudson* totalling $7,755,615.44.

Next, FDIC argues that the 1983 Policy was described as a renewal policy and the inclusion of Endorsement No. 7 is ineffective because the change of terms was not adequately brought to the attention of insureds. However, the Court finds that the endorsement was in a short, separately attached notice that is adequate and thus effective. *See Government Employees Ins. Co. v. United States*, 400 F.2d 172, 175 (10th Cir.1968) ("Hence, while it is inequitable to require an

insured to search the fine print of each renewal policy, to require that he be aware of a short, separately attached boldly worded modification, seems clearly appropriate." (footnote omitted)). Moreover, the insureds were sophisticated bankers, and John Hudson even owned an insurance agency. FDIC's argument is without merit.

▮ FDIC also argues that the endorsement was sent a month after the policy was effective. However, the endorsement was tendered and accepted, and the delivery date is unimportant. The Court concludes that all coverage ceased when FDIC was appointed liquidator of the bank, and neither an insurance claim nor a notice of potential claim was properly made while coverage was in effect.

**B.  *Inadequacy of Notices of Claims During the Policy Period.***

▮ American contends that because the pertinent insurance policy is a claims-made policy, then only claims actually made against the insureds during the policy period from December 20, 1982 to December 20, 1986 are covered. *See* A. Windt, *Insurance Claims and Disputes,* § 1.07, at 20 n. 67 (2d ed. 1988) ("A claims-made policy, ... [as opposed to an occurrence policy], is one under which the company agrees to assume liability for acts or omissions ... as long as the claim against the insured arising out of these acts or omissions is made during the policy period." (emphasis omitted)).  Consequently, American contends that the insurance policy issued to the directors and officers of the bank does not provide coverage for the claims asserted by FDIC in *FDIC v. Hudson.*

American further contends it was never alerted to any significant violations of laws or banking regulations in the renewal application for the liability insurance. A claim may only be treated as made during the policy period ending December 20, 1986, if during that period an insured becomes aware of an occurrence that may subsequently support a claim against the officers and directors for wrongful conduct *and* if written notice is provided to American. The Court finds that these joint requirements were not met while coverage was in effect.

Therefore, there is no coverage under the policy for the claims asserted in *FDIC v. Hudson,* because the claims were neither made during the policy period, nor was adequate or timely notice of the claims provided pursuant to the policy. The reason that the insurance industry has replaced occurrence policies with claims-made policies is that the former left liability exposure open-ended and therefore insurers were unable to accurately underwrite risks, compute premiums, and establish reserves. *National Union Fire Ins. Co. v. Bauman,* No. 90 C 0340, 1992 WL 1738, at ** 4–6 & n. 6 (N.D.Ill. Jan. 2, 1991). Here, FDIC would have this Court make the policy one that covered occurrences rather than one for claims actually made during the policy period, and that simply was not what the insurer and the insureds bargained for. An occurrence policy creates open-ended liability for the insurer and thus would command significantly higher premiums. In contrast the claims-made policy limits the insurer's liability to a term certain and therefore can be offered at much more reasonable and thus affordable rates.

It is noted that the declarations page of the policy, in one-quarter inch bold, outlined, capitalized letters, reads: "THIS IS A CLAIMS MADE POLICY, PLEASE READ CAREFULLY." FDIC's brief at ex. 3, p. 1 (July 17, 1992). Further, the next page in three-eighths inch bold, outlined, capitalized letters, superimposed across the page at a forty-five degree angle, reads: "THIS IS A CLAIMS MADE POLICY. READ IT CAREFULLY." *Id.* at ex. 3, p. 2. There is simply little room to question that the policy is anything other than a claims-made policy. The only exception is if the insureds become aware of occurrences during the policy period and give proper notice. Here, the insureds signed documents expressly disclaiming awareness of any such occurrences, and FDIC has not offered any testimony or affidavits to the contrary. The Court declines FDIC's invitation to rewrite the policy for the parties.

The Court rejects FDIC's contention that there was adequate notice of claims made in this action. *See American Cas. Co. v. FDIC,*

944 F.2d 455, 460 (8th Cir.1991); *American Cas. Co. v. Wilkinson,* No. CIV–89–1609–W, 1990 WL 302175, at ** 9–10 (W.D.Okla. Dec. 21, 1990), *aff'd on other grounds sub nom., American Cas. Co. v. FDIC,* 958 F.2d 324, 328 (10th Cir.1992). FDIC contends that notice was provided in the October 28, 1986 renewal application, but it was only two days later in an application to BancInsure that the insureds themselves disavowed giving any notice of claims or potential claims when they represented that they were aware of no occurrences that could give rise to any future claims. Such representations are fatal to subsequent claims. *FDIC v. Continental Cas. Co.,* 796 F.Supp. 1344, 1352 (D.Or.1991). At most there was only notice of the poor financial condition of the bank, and that is insufficient.

The Court further finds there is no applicability of constructive notice of claims in this case. *See id.* at 1352–54. Such notice does not meet specificity requirements. *See American Cas. Co. v. FDIC,* 944 F.2d at 460 (holding that notice was too general, and thus lacked requisite specificity); *accord California Union Ins. Co. v. American Diversified Sav. Bank,* 914 F.2d 1271, 1278 (9th Cir. 1990), *cert. denied sub nom.,* 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991); *National Union Fire Ins. Co. v. Bauman,* 1992 WL 1738 at * 8.

Taking FDIC's argument to its logical conclusion would result in a situation where the bank directors and officers would be better served to disguise potential claims so that they would be covered by insurance well into the future while not drawing attention to conduct that might increase future premiums, or terminate coverage altogether. Such a result is unconscionable. It is noted that the untimely notice by FDIC on August 27, 1987 was not even properly addressed to American, but rather was mailed to Ruth Sottong, an Oklahoma City insurance broker. Such notice is not in conformity with the specific contract requirement, and thus ineffective. It is undisputed that all parties are sophisticated business persons who transact multi-million dollar transactions, and are expected to follow the technical details of the policy regarding notice. "The purpose of requiring a particular method of giving notice is to prevent disputes over whether notice was received." *Aqua Bar & Lounge, Inc. v. United States,* 438 F.Supp. 655, 657 (E.D.Pa. 1977). That is the very evil intended to be prevented. What is at stake here is that insurance companies will become forever embroiled in costly and time-consuming litigation if a bright-line decision is not developed.

■ Consequently, for all of these reasons, the Court concludes that there was no adequate notice of claims or potential claims given during the policy period. Because no adequate notice was given, then no coverage was triggered.

## C. Lack of Proper Notices of Claims During the Effective Discovery Period.

■ On December 24, 1986, the directors and officers of the bank elected to purchase discovery clause insurance pursuant to ¶ 2(b) of the policy, which provides:

Discovery Clause—*If the Insurer shall cancel or refuse to renew the policy, the Bank shall have the right,* upon payment of seventy-five percent (75%) of the annual premium or twenty-five percent (25%) of the three year prepaid premium set forth in Item 5 of the Declarations, *to an extension of the coverage granted by this policy with respect to any claim or claims which shall be made against the Directors of Officers during the period of twelve calendar months after the date of such cancellation* or refusal to renew, but only with respect to any Wrongful Act committed before the date of such cancellation or nonrenewal. A written request for this extension, together with payment of the appropriate premium must be made within ten (10) days after the effective date of cancellation or non-renewal of the policy.

FDIC's brief at ex. 3, p. 2, ¶ 2(b) (July 17, 1992) (emphasis supplied). As expressed in this clause, liability coverage is limited to claims made while the discovery period remains in effect, and was intended to cover a period of time after the *insurer* canceled the policy. As found above, the discovery period is cut short if the bank ceases business pursuant to Endorsement No. 7, which certainly

cannot be considered to be an act of the insurer. Therefore, the discovery period provision does not extend to claims made subsequent to termination of coverage. Moreover, the plain language of this provision mentions only claims, and thus excludes potential claims by negative implication.

The Court rejects FDIC's contentions that demands made upon the directors and officers that they comply with federal regulations or their entry into a Memorandum of Understanding with banking regulators constitute claims. These demands and memorandum did not threaten formal action, nor propose any personal liability for any losses. *See California Union Ins. Co. v. American Diversified Sav. Bank*, 914 F.2d at 1276–77 (letters detailing deficiencies and requesting immediate action were not claims made within the meaning of the insurance policy); *accord MGIC Indem. Corp. v. Home State Sav. Ass'n*, 797 F.2d 285, 288 (6th Cir.1986) ("[A] claim that a wrongful act has occurred is not the same thing as a claim for payment on account of a wrongful act. . . . The agreement, as we read it, is speaking not of a claim that wrongdoing occurred, but a claim for some discrete amount of money owed to the claimant on account of the alleged wrongdoing."). Consequently, there was a lack of proper notice of claims during the effective discovery period. For all of the above reasons partial summary judgment should be granted to American and denied to FDIC.

## V. CONCLUSION

Accordingly, summary judgment is **GRANTED** to plaintiff American Casualty Company and against defendant Federal Deposit Insurance Corporation, as receiver and liquidator for First State Bank of Blanchard, Oklahoma, and in its corporate capacity. Individual defendants John Hudson; Janet Hudson; Randall Hill; Jack Marshall; Alford L. Robertson; and Jack B. Rackley failed to respond to the motion, and therefore the motion is deemed confessed and is **GRANTED** as to them. *See* W.D.Okla.R. 14(A). Further, the Court has reviewed the pleadings filed in this matter and finds that the motion is meritorious as to these defendants. *See John v. Louisiana*, 757 F.2d 698,

709 (5th Cir.1985) (" '[S]ummary judgment cannot be supported solely on the ground that [defendants] failed to respond to [plaintiff's] motion for summary judgment.' " *quoted in Burk v. K Mart Corp.*, 956 F.2d 213, 214 n. 2 (10th Cir.1991).

This portion of the Opinion regarding the individual defendants will only be reconsidered in accordance with Fed.R.Civ.P. 60(b). *Hancock v. City of Okla. City*, 857 F.2d 1394, 1395–96 (10th Cir.1988); *Meade v. Grubbs*, 841 F.2d 1512, 1520–22 & nn. 6 & 7 (10th Cir.1988); and *D G Shelter Prods. Co. v. Forest Prods. Co.*, 769 F.2d 644, 645 (10th Cir.1985).

FDIC's cross-motion for partial summary judgment is **DENIED**, and FDIC's counterclaim is **DISMISSED**. The Court therefore declares that there is no insurance coverage under the policy for *FDIC v. Hudson*, No. CJ–88–8115 (Okla.County Dist.Ct.1988), and American Casualty Company is not required to answer to any judgment, including defense costs, which may be entered against any individual defendant in that suit.

The only other matter left unresolved in the Complaint is in Count V, which lists other grounds for noncoverage under the policy. That matter and the previously unmeritorious issue on the "Insured v. Insured" exclusion are now moot. Due to the determination in this Memorandum Opinion, the Court finds that no justiciable issue remains left pending in this action. Therefore, a judgment consistent with this Memorandum Opinion has been filed separately.

**IT IS SO ORDERED.**

### JUDGMENT

This action was decided on summary judgment for plaintiff American Casualty Company and against defendants Federal Deposit Insurance Corporation, as receiver and liquidator for First State Bank of Blanchard, Oklahoma, and in its corporate capacity; John Hudson; Janet Hudson; Randall Hill; Jack Marshall; Alford L. Robertson; and Jack B. Rackley.

**IT IS ORDERED AND ADJUDGED** that judgment is hereby entered for American Casualty Company and against defendants

Federal Deposit Insurance Corporation, as receiver and liquidator for First State Bank of Blanchard, Oklahoma, and in its corporate capacity; John Hudson; Janet Hudson; Randall Hill; Jack Marshall; Alford L. Robertson; and Jack B. Rackley.

## ORDER

May 12, 1993

The Court has received and reviewed defendant FDIC's Motion for Reconsideration and to Alter or Amend Judgment, citing Fed.R.Civ.P. 59. Plaintiff has responded in objection to the relief sought, and defendant has filed a reply brief. The Tenth Circuit has defined the standard for a Rule 59 motion alleging newly discovered evidence:

> [w]hen supplementing a Rule 59(e) motion with additional evidence, the movant must show either that the evidence is newly discovered [and] if the evidence was available at the time of the decision being challenged, that counsel made a diligent yet unsuccessful effort to discover the evidence.

*Buell v. Security General Life Ins. Co.,* 987 F.2d 1467, 1472 (10th Cir.1993), quoting *Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1523 (10th Cir. 1992), which in turn quoted *Chery v. Bowman,* 901 F.2d 1053, 1057–58 n. 6 (11th Cir. 1990). The evidence at issue here was not newly discovered and was available to counsel at the time of the challenged decision. Thus, the proffered evidence meets neither prong of the test announced by this Circuit. Were this evidence to be considered, however, the Court finds it is completely irrelevant to the issues, as the written contract is not ambiguous and extrinsic evidence cannot be, under Oklahoma law, used to interpret the contract. FDIC's remaining arguments simply assert once again its position in this case and its disagreement with the Court's earlier ruling. FDIC is certainly free to make these arguments, but the appropriate forum is the Circuit Court of Appeals, not this Court which has heard the arguments, considered them, and rejected them after full discussion.

Accordingly, FDIC's Motion for Reconsideration and to Alter or Amend Judgment is denied.

**IT IS SO ORDERED.**