17 F.3d 62
 Resolution Trust Corporation, receiver for Hansen Savings
Bank, SLA, Receiver.
AMERICAN CASUALTY CO. OF READING, PENNSYLVANIA; Continental
Casualty Co., Plaintiffs,
v.
Nicholas CONTINISIO; Peter T. Ranere, Jr.; Charles A.
Crowley; Robert E. Small; Estate of A. Lance Littlefield;
John Alden Miller; Andrew G. Berenato; James C. Henry,
Jr.; James D. Rodio; John Nelson Ake; Joseph Caruso;
James Gorab; Frank J. Grasso; Federal Deposit Insurance
Corporation; John Machise, Defendants.
Federal Deposit Insurance Corporation, Appellant No. 93-5245.
Peter T. Ranere, Jr.; Estate of A. Lance Littlefield; John
Alden Miller; James C. Henry, Jr.; John Nelson
Ake, Appellants No. 93-5248.
Nicholas Continisio, Appellant No. 93-5255.
Andrew G. Berenato; James D. Rodio; Robert E. Small; John
Machise, Appellants No. 93-5256.
Joseph Caruso, Appellant No. 93-5259.
 Nos. 93-5245, 93-5248, 93-5255, 93-5256 and 93-5259.
 United States Court of Appeals,
Third Circuit.
 Argued Tuesday, Jan. 25, 1994.
Decided Feb. 28, 1994.
 
 Eugene J. Comey (Argued), Robert F. Schiff, Katherine Connor Linton, Comey & Boyd, Washington, DC, Edward F. Mannino Mannino, Walsh & Griffith, Philadelphia, PA, Ann S. DuRoss, Colleen B. Bombardier, Maria Beatrice Valdez, James P. Flannery, Federal Deposit Insurance Corp. Washington, DC, Attorneys for Appellant Federal Deposit Insurance Corporation.
 Richard A. Simpson (Argued), Merril Hirsh, Stephen W. Funk, Ross, Dixon & Masback, Washington, DC, Gerald T. Ford, Siff Rosen, Newark, NJ Attorneys for Appellees American Casualty Company of Reading, Pennsylvania and Continental Casualty Company.
 Before: MANSMANN, NYGAARD and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 The Federal Deposit Insurance Corporation ("FDIC") appeals from a summary judgment finding no insurance coverage of the former directors and officers of a failed thrift, First Federal Savings and Loan Association of Hammonton, New Jersey ("First Federal"). The district court had federal question jurisdiction over this declaratory judgment action under 28 U.S.C. Sec. 1331 construed with 12 U.S.C. Sec. 1819(b)(2)(A), which deems any lawsuit to which the FDIC is a party to arise under the laws of the United States. This court has jurisdiction to review the district court's grant of summary judgment under 28 U.S.C. Sec. 1291.
 
 I. Facts
 
 2
 In the 1970's, First Federal Savings and Loan of Hammonton, New Jersey ("First Federal"), purchased directors' and officers' ("D & O") liability insurance written by MGIC Indemnity Corporation ("MGIC"). MGIC renewed First Federal's D & O policy for the period June 26, 1981 to June 26, 1984 (the "1981 policy"). In 1983, Continental Casualty Company, a subsidiary of American Casualty Company of Reading, Pennsylvania (collectively "CNA"), acquired MGIC's casualty insurance business and assumed all obligations under the 1981 policy.
 
 
 3
 The 1981 policy was a "claims-made" policy that provided coverage for
 
 
 4
 [l]oss in respect of any Wrongful Act committed prior to the termination of this policy arising from any claim made (i) within the policy period or (ii) within the discovery period if the right is exercised ... in accordance with Clause 2(B).... [A]ny claim made subsequent to the policy period as to which notice was given to the Insurer within the policy period ... shall be treated as a claim made during the policy period.
 
 
 5
 A notice of claims provision detailed the requirements for giving notice and made written notice a condition precedent to the insureds' rights under the policy. It required that the insureds give written notice to the insurer at a specified address of any claims or occurrences that might give rise to claims after the policy expired. The Assumption Endorsement added by CNA changed the address and directed claims to its Manager of Professional Liability Claims.
 
 
 6
 The 1981 policy also contained two relevant provisions on nonrenewal of the insurance contract. First, the cancellation clause required the insurer to provide 30 days' notice of nonrenewal. Second, an endorsement allowed First Federal to purchase a one-year extension of the coverage provided by the 1981 policy for any claims made with respect to a "Wrongful Act" committed prior to the nonrenewal. Upon nonrenewal, this endorsement required CNA to provide notice to First Federal of the availability of this extended coverage, commonly called a "discovery period."
 
 
 7
 As the end of the 1981 policy period neared, First Federal responded to CNA's renewal notice with an application attaching copies of three of its most recent reports to the Federal Home Loan Bank Board ("FHLBB Reports") and the most recent auditor's report. The reports contained troubling information about First Federal's financial condition, including a warning on a volume of recently acquired loans that
 
 
 8
 [l]ack of proper documentation, and, in the case of one major accommodation, questionable business practices in the origination and servicing of [some of these loan] obligations make it impossible to evaluate the collectibility of a significant portion of the aggregate outstanding balances of these loans.
 
 
 9
 On the day the 1981 policy expired, the insurance agent advised First Federal that it would be temporarily covered by a binder with the same policy form. The next month, CNA offered to renew the policy with an endorsement excluding suits by regulatory agencies.[1] After determining that it could not obtain coverage without a regulatory exclusion from another carrier before the expiration of the binder, First Federal accepted CNA's new terms. The terms of this 1984 policy were retroactive to the date the 1981 policy expired.
 
 
 10
 Four months after issuing the 1984 policy, CNA mailed a notice of cancellation. Following cancellation, First Federal purchased a one-year discovery period effective March 22, 1985 through March 22, 1986.
 
 
 11
 During the 1981 and 1984 policy periods, First Federal sent no formal notices of claims or potential claims against the directors and officers to CNA. During the discovery period following the 1984 policy, however, First Federal filed several formal notices of claims and potential claims by third parties. None of these notices directly discussed the potential for claims brought by the FDIC.
 
 
 12
 First Federal underwent a supervisory merger approved by the FHLBB in 1988. Under this arrangement, the FDIC in its capacity as receiver assumed substantially all of First Federal's assets and liabilities. In 1991, the FDIC in its corporate capacity sued 14 former directors and officers of First Federal seeking $60 million in damages.
 
 
 13
 The claims for which the FDIC seeks insurance coverage arose from the directors' and officers' handling of the problem loans identified by the auditor's report filed with the renewal application. CNA brought this declaratory judgment action to contest coverage.
 
 
 14
 The district court granted CNA's motion for summary judgment finding no coverage and denied the FDIC's cross-motion. The court ruled that (1) First Federal did not give adequate notice during the 1981 policy period of facts that might give rise to a claim to trigger coverage, and (2) First Federal was not entitled to purchase a discovery period under the 1981 policy because the policy was renewed. These summary judgment rulings are reviewed de novo, with all facts and inferences viewed in the light most favorable to the nonmovant. Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 146 (3d Cir.1993); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 II. Discussion
 A. Right to Extend Coverage
 
 15
 FDIC argues that the exclusion of coverage for regulatory suits added in the 1984 policy was such a material change that it constituted a constructive nonrenewal of the 1981 policy and therefore triggered First Federal's right to purchase a discovery period and notice of this alternative. CNA contends, and the District Court agreed, that the 1981 policy was renewed and thus there was no right to a discovery period or notice.
 
 
 16
 CNA further contends that, even if First Federal was entitled to purchase a discovery period, the interval ran from the end of the 1981 policy for one year; because no notice was given of these claims during that year, the discovery period would not be helpful to the defendants. The FDIC asks us to declare that the 1981 policy continues in force because effective notice of nonrenewal has not yet been tendered by CNA; therefore, either a claim filed now would be covered by the 1981 policy directly or the FDIC could purchase a discovery period beginning on the date of termination when an effective notice is delivered.
 
 
 17
 The district court relied on the parties' agreement that this case is governed by federal common law as given substance by New Jersey law. American Cas. Co. v. Continisio, 819 F.Supp. 385, 396 (D.N.J.1993). During oral argument, the FDIC indicated that the parties agree New Jersey law applies. Because the task before us is interpretation of a contract, the law applicable to the original contracting parties seems appropriate. In any event, the distinction is not important because there appears to be no conflict in New Jersey and federal law for purposes of the issues we resolve today, so we will look to New Jersey's substantive law so far as it goes.
 
 
 18
 The primary issue to be resolved is whether a change in material terms constitutes constructive nonrenewal of an insurance policy under New Jersey law. Only if CNA refused to renew the policy did First Federal have a contractual right to purchase a discovery period and a right to be notified of its option.
 
 
 19
 Defendants believe that the mirror-image rule of contract offer and acceptance should apply to insurance renewals. Cf. Looman Realty Corp. v. Broad St. Nat'l Bank, 74 N.J.Super. 71, 180 A.2d 524, 530 (App.Div.), certification denied, 37 N.J. 520, 181 A.2d 782 (1962) (holding that a purported "acceptance" on different terms is a rejection and a new offer). They interpret the application of this rule to defeat "renewal" if the parties agree to vary any terms (presumably other than premium and policy period). If defendants' application and interpretation of this rule applies, CNA's offer to "renew" the policy only if there is a regulatory exclusion is no renewal at all, but rather an entirely new policy, and all provisions regarding nonrenewal are triggered.
 
 
 20
 New Jersey statutes imply that renewal can be effected without an exact replication of terms from policy to policy. The New Jersey automobile insurance statutes define the term "renewal" as "the issuance and delivery by an insurer, at the end of the policy period, of a policy superseding a policy previously issued and delivered by the same insurer...." N.J.S.A. 17:33B-33(b) (1990) (emphasis added); see also N.J.S.A. 17:29C-6(E) (1968). New Jersey has also incorporated this definition into its insurance regulations, including those on nonrenewal of commercial insurance policies. See N.J.A.C. 11:1-20.2(j) (Supp. 3/18/91). These statutes and regulations also permit "the issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term" as alternative methods of renewal. If extension of identical terms is required, there would be no reason for a superseding policy as an alternative.
 
 
 21
 The New Jersey Supreme Court addressed the effect of a material change in terms upon renewal of a comprehensive personal liability policy in Bauman v. Royal Indemnity Co., 36 N.J. 12, 174 A.2d 585 (1961). The insurance company changed the terms, without notifying the insured, to exclude coverage for workers' compensation claims. The New Jersey Supreme Court voided any reduction in coverage upon renewal that was not called to the insured's attention in order to fulfill the insured's expectations. Id. 174 A.2d at 590. Bauman went on to comment that
 
 
 22
 [The insurer] had the undoubted right, by appropriate alteration in the terms of its policies, to exclude such coverage in later renewals but, in such event, common fairness as well as legal duty dictated that it call the lessened coverage to the attention of the insureds so that they might suitably protect themselves.
 
 
 23
 Id. 174 A.2d at 592 (emphasis added). Thus, if an insured accepts coverage on different terms, with knowledge of the change in coverage, a valid renewal could exist.
 
 
 24
 Even in a state where "renewal" is strictly defined as "continuation of coverage on the same, or nearly the same, terms as the policy being renewed," acceptance of new terms constitutes a renewal. McCuen v. American Cas. Co., 946 F.2d 1401, 1404 (8th Cir.1991). A rejected offer of materially different terms, including a regulatory exclusion, decrease in policy and discovery periods, and increase in premium and deductible, was held to be a nonrenewal under Iowa law. Id. In contrast, Iowa law recognizes an agreement to a material change in the terms of a directors' and officers' liability policy, including an exclusion for regulatory suits, as a renewal. American Cas. Co. v. FDIC, 944 F.2d 455, 460 (8th Cir.1991).
 
 
 25
 Defendants contend, however, that Barbara Corp. v. Bob Maneely Insurance Agency, 197 N.J.Super. 339, 484 A.2d 1292 (App.Div.1984), requires a "notice of nonrenewal" during the renewal process if the renewal is conditioned upon a change of terms. In Barbara Corp., the court considered a regulation requiring fire insurers to provide written notice of "intent not to renew." The insurer did not renew a fire insurance policy when the insured did not pay its premium; the insurer also did not notify the insured of its loss of coverage. The insurer argued that it was not required to notify the insured of its "intent not to renew" because it intended to renew the policy upon the condition that the insured pay its premium. However, the Barbara Corp. court held that notification is required "whether the intent not to renew is absolute, such as for underwriting reasons, or only conditional, depending, as ... here, upon the insured's failure to pay the premium." Id. 484 A.2d at 1295.
 
 
 26
 Defendants argue that Barbara Corp. should be extended to require "notice of nonrenewal" in this case, where renewal was conditioned upon the acceptance of the regulatory exclusion. But Barbara Corp. is distinguishable. Barbara Corp. was never notified that the policy was about to expire without renewal and believed the fire insurance policy was still in effect. If Barbara Corp. had known that a premium was due, it would have paid the premium and its insurer agrees that it would have renewed the insurance policy. The New Jersey public policy underlying formal notices of "intent not to renew" is to enable the insured to avoid lapses in coverage due solely to lack of notice. With notice, the insured has the choice to meet the insurer's preconditions, obtain alternative coverage, or choose to allow the policy to lapse. Id.
 
 
 27
 In this case, the addition of the regulatory exclusion was brought to the attention of First Federal and it had time to seek alternative coverage or accept the new policy. No need existed for a "notice of nonrenewal" because First Federal remained covered. A more formal notice could not have prevented an unintended lapse when there was neither a lapse nor a lack of awareness of the insurer's conditions. Where the conditions for renewal coverage are made evident to the insured, we predict New Jersey law would not require formal notification until the insured rejects the renewal conditions. Cf., e.g., Adams v. Greenwood, 10 F.3d 568, 571-72 (8th Cir.1993) (reaching the same result under Minnesota law); American Cas. Co. v. RTC, Civ. No. MJG-92-1138, slip op. at 1114, 1993 WL 655032 (D.Md. Nov. 1, 1993) (construing Maryland law).
 
 
 28
 Defendants also argue that First Federal's agreement to the terms of the 1984 policy did not constitute a valid renewal because First Federal was not aware of its right to purchase a discovery period upon nonrenewal and was not notified by CNA of this right during the renewal process. They argue that a renewal based upon agreement to new terms is only valid if First Federal "knowingly waived" its right to a discovery period. Therefore, they believe both a notice of nonrenewal and a notice of a discovery period were required.
 
 
 29
 The 1981 policy provision creating the right to a discovery period reads as follows:
 
 
 30
 If the Insurer shall cancel or refuse to renew this Policy, [First Federal] shall have the right to an extension of the cover granted by this Policy in respect of any claim or claims which may be made against the Directors or Officers during the period of twelve calendar months after the date of such termination but only in respect of any Wrongful Act committed before the date of such cancellation or nonrenewal. The Insurer shall give written notice informing [First Federal] of its option to purchase this extension at a rate of 25 percent of the current annual installment. Application for this extension must be made within thirty (30) days after the effective date of cancellation or nonrenewal of the Policy.
 
 
 31
 Emphasis added.
 
 
 32
 As defendants acknowledge, the policy language clearly indicates that the right to a discovery period only accrues upon nonrenewal or cancellation. Since First Federal's agreement to the 1984 policy constituted a renewal, the right to a discovery period was not triggered. Therefore, First Federal had no right to "knowingly waive."
 
 
 33
 Defendants alternatively contend that notice of the discovery period should be required during the renewal process in order to allow the insured to make a fully informed decision about renewal. However, as a sophisticated financial institution, First Federal should be aware of the rights printed in its policy. First Federal hired an outside risk counselor in addition to the insurance manager it employed full-time. Cf. McNeilab, Inc. v. North River Ins. Co., 645 F.Supp. 525, 547 (D.N.J.1986) (limiting sympathy for an insured that maintained "a Corporate Insurance Department consisting of an expert insurance staff with a legal staff at its disposal"), aff'd mem., 831 F.2d 287 (3d Cir.1987). Although First Federal did not enjoy the bargaining advantages Johnson & Johnson had in McNeilab, only the ability to read the policy is at issue here, not the ability to negotiate more favorable terms. Especially in light of the policy's 2 1/2-page length with concise endorsements, we perceive no unconscionable unfairness.
 
 
 34
 Because First Federal's agreement to the terms of the 1984 policy with knowledge of the regulatory exclusion constituted a renewal of the 1981 policy as a matter of New Jersey law, CNA was not required to provide either notice of nonrenewal or notice of the discovery period. Therefore, we need not consider defendants' remedy contentions.
 
 B. Constructive Notice of Claim
 
 35
 FDIC contends that the information First Federal submitted with the renewal application in 1984 was sufficient to trigger coverage under the 1981 policy because it alerted CNA of occurrences that could give rise to claims. CNA replies that information sent to its underwriting department with a renewal application does not satisfy the requirements of the notice of claim provision in the policy. The District Court agreed with CNA, holding that the renewal application did not constitute notice as a matter of law because it "construe[d] the notice of claim provision as imposing a duty on the insured to give some kind of formal, written notification of occurrences in order to evoke coverage." Continisio, 819 F.Supp. at 398.
 
 
 36
 The policy requires both subjective awareness of the potential for a claim and notice to the insurer of that claim. It required that "as soon as practicable" after the insureds (1) receive notice of a claim or "become aware of any occurrence which may subsequently give rise to a claim," they must (2) give written notice to the insurer at a specified address. The Assumption Endorsement added by CNA stated that: "All claims or inquiries relating to the Policy should be directed to Manager, Professional Liability Claim[s], Continental Casualty Company at the above address." We find no ambiguity in the policy language.[2]
 
 
 37
 Furthermore, requiring a formal notice of claim that the insurer can easily recognize as such comports with the distinction between claims-made and occurrence insurance policies. The New Jersey Supreme Court strictly construed the time periods for giving notice of claims in a claims-made policy in Zuckerman v. National Union Fire Ins. Co., 100 N.J. 304, 495 A.2d 395 (1985):
 
 
 38
 In the "occurrence" policy, the peril insured is the "occurrence" itself. Once the occurrence takes place, coverage attaches even though the claim may not be made for some time thereafter. While in the "claims made" policy, it is the making of the claim which is the event and peril being insured and, subject to policy language, regardless of when the occurrence took place.
 
 
 39
 Id. 495 A.2d at 398 (quoting S. Kroll, The Professional Liability Policy 'Claims Made,' 13 Forum 842, 843 (1978)).
 
 
 40
 Notice provisions serve different purposes in occurrence and claims-made policies. In an occurrence policy, notice provisions are included to help the insurer investigate, settle, and defend claims; they do not define coverage and should be "liberally and practically construed":
 
 
 41
 By contrast, the event that invokes coverage under a "claims made" policy is transmittal of notice of the claim to the insurance carrier.... Thus, an extension of the notice period in a "claims made" policy constitutes an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy.
 
 
 42
 Id. 495 A.2d at 406 (emphasis added). Claims-made policies are less expensive because underwriters can calculate risks more precisely since exposure ends at a fixed point. Extension of time periods would significantly increase both the risk to insurers and the cost to insureds. Id. 495 A.2d at 400, 406; see also id. 495 A.2d at 398-400 (explaining the development of claims-made policies and why occurrence policies are necessarily more expensive); National Union Fire Ins. Co. v. Bauman, 1992 WL 1738, at * 5-6 (N.D.Ill. Jan. 2, 1992) (expanding the history of claims-made policies), aff'd sub nom. National Union Fire Ins. Co. v. Baker & McKenzie, 997 F.2d 305 (7th Cir.1993). If the potential exposure period is extended by accepting the defendants' version of "notice," claims-made policies must necessarily become more expensive.
 
 
 43
 In another suit between our parties, an Oklahoma District Court wisely perceived a perverse incentive that would be created by an opposite holding:
 
 
 44
 Taking the FDIC's argument to its logical conclusion would result in a situation where the bank directors and officers would be better served to disguise potential claims so that they would be covered by insurance well into the future while not drawing attention to conduct that might increase future premiums, or terminate coverage altogether.
 
 
 45
 American Cas. Co. v. FDIC, 821 F.Supp. 655, 664 (W.D.Okla.1993); cf. United Ass'n Local 38 Pension Trust Fund v. Aetna Cas. & Sur. Co., 790 F.2d 1428, 1433 (9th Cir.1986) (Norris, J., dissenting) ("[I]f an insured can effectively convert a claims-made policy ... into an occurrence policy simply by submitting a wealth of documentation, insurers will either stop issuing such policies, or will raise the premiums accordingly."), amended on other grounds, 811 F.2d 500 (1987).
 
 
 46
 Because the notice of claim provision defines coverage under this policy, the only reasonable interpretation of the policy provision is that the insureds must regard the information they possess as a potential claim and formally notify their insurer through its claims liability department that a claim may be asserted. See FDIC v. Barham, 995 F.2d 600, 604 n. 9 (5th Cir.1993) ("Because notice of a claim or potential claim defines coverage under a claims-made policy, we think that the notice provisions of such a policy should be strictly construed."). We concur that the notice must be given through formal claims channels because we recognize that the information needed, or at least the perspective utilized in reviewing it, varies when predicting the probability of future losses and recognizing the need to investigate a claim that may be made based on past occurrences. See FDIC v. St. Paul Fire & Marine Ins. Co., 993 F.2d 155, 160 (8th Cir.1993); FDIC v. Continental Cas. Co., 796 F.Supp. 1344, 1353 (D.Or.1991).
 
 
 47
 Insureds may not deny knowledge of potential claims in their renewal application and rely on information submitted with the same application to support an argument that the insurer should have known a claim could be made. In so holding, we join a growing line of cases prohibiting an insured from insisting that its insurer's underwriting department sift through a renewal application and decide what should be forwarded to the claims department on the insured's behalf. See, e.g., St. Paul Fire & Marine Ins. Co., 993 F.2d at 159-60 ("[T]he bank ... answered negatively to specific questions concerning bank officers and directors' knowledge of errors or omission[s] which might give rise to a claim.... Notice that would cause one to investigate a renewal for insurance must surely be different than notice to investigate potential claims under a 'claims made' policy."); American Cas. Co. v. FDIC, 944 F.2d at 460 (holding that a renewal application in which bank officers claimed the bank was in no danger while predicting a $400,000 loss and reporting a cease-and-desist order was ineffective notice of potential claims); California Union Ins. Co. v. American Diversified Sav. Bank, 914 F.2d 1271, 1278 (9th Cir.1990) (finding that general financial documents did not constitute constructive notice of a claim when "the principal documents relied upon would not have alerted [the insurer] to anything [the insured] considered to be a potential claim"), cert. denied, 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991); American Cas. Co. v. RTC, Civ. No. MJG-92-1138, slip op. at 11-14, 1993 WL 655032 (D.Md. Nov. 1, 1993) (finding no notice when the insureds' renewal application claimed compliance with an agreement under which the FHLBB would forbear from bringing claims); American Cas. Co. v. FDIC, 821 F.Supp. at 663-64 (refusing to rewrite a claims-made policy into an occurrence policy because general information in a renewal application cannot overcome insureds' denials of potential claims); FDIC v. Continental Cas. Co., 796 F.Supp. at 1351-54 (finding that a renewal application reporting general financial troubles and a FDIC cease-and-desist order was ineffective notice when insureds stated they were unaware of any occurrence that could subsequently give rise to a claim and the documents were not designed to give notice of a potential claim); cf. National Union Fire Ins. Co. v. Baker & McKenzie, 997 F.2d at 309 (holding that an insurer was not required to collate documents from different sources notifying it of the same claim by other insureds under other policies and conclude a claim might be made in the future).
 
 
 48
 We recognize that one opinion of the United States Court of Appeals for the Ninth Circuit holds that there is a genuine issue of material fact under California law when evidence of an official audit is submitted with a renewal application that denies knowledge of potential claims. United Ass'n Local 38 Pension Trust Fund v. Aetna Cas. & Sur. Co., 790 F.2d 1428, 1430-31 (9th Cir.1986), amended on other grounds, 811 F.2d 500 (1987) (discussing an NLRB audit of an ERISA plan); id. at 1433 (Norris, J., dissenting). We believe the Supreme Court of New Jersey would adopt the position taken in the dissent, which places the burden on the insured to provide notice of potential claims that the insurer will recognize as such. See id. Ambiguous audit notes which have not resulted in claims coupled with a denial of potential claims by the insured are not sufficient to create a jury issue on whether adequate information has been appropriately submitted.
 
 III. CONCLUSION
 
 49
 In summary, the 1984 policy constituted a renewal of the 1981 policy under New Jersey law. Therefore, First Federal had no right here to purchase a discovery period nor a right to notice of the possibility of a discovery period. Furthermore, the defendants did not fairly apprise their carrier of a claim the 1981 policy might have covered within an appropriate time. Thus, the FDIC's claims against the directors and officers of First Federal are not covered by the 1981 policy assumed by CNA.
 
 
 50
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 The regulatory exclusion endorsement to the 1984 policy reads in pertinent part:
 It is understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors [or] Officers based upon or attributable to any action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation....
 
 
 [2]
 The FDIC asserted at oral argument that the District Court found the policy language to be ambiguous. We do not find a ruling of ambiguity that is attacked on appeal. In the September 11, 1992, opinion and order of "interpretive discovery," the district court noted two potential ambiguities. First, whether these occurrences fell under the rubric of "claims" or "potential claims"; second, whether notice of potential claims could be given during the discovery period or only during the policy period. The first question was answered: the FDIC did not make a claim during the policy period, so only notice of facts that could give rise to a potential claim is at issue. The second question is moot because we hold that First Federal had no right to a discovery period
 The District Court's opinion disposing of this case does not identify any other ambiguities. In the subsection addressing whether the notice portion of the policy is ambiguous, the court found it unnecessary to resolve the issue because the FDIC's suggested interpretation was unreasonable. Continisio, 819 F.Supp. at 398-99.