TERRY R. MEANS, UNITED STATES DISTRICT JUDGE
I. INTRODUCTION
Before the Court is a motion for summary judgment by Landmark American Insurance Company ("Landmark") (doc. 38). The motion asks the Court to determine whether Landmark's insured invoked coverage by properly reporting a claim under a lawyer's professional-responsibility policy. More specifically, the motion asserts that the inclusion of a claim supplement in a renewal application failed to trigger Landmark's duty to defend and indemnify. After review, the Court GRANTS Landmark's motion based upon the following rationale.
II. FACTUAL & PROCEDURAL BACKGROUND[1]
A. About the Parties
Landmark is an insurance company providing professional-liability-insurance policies from its principal place of business in Atlanta, Georgia.[2] (Compl. (doc. 1) 1.)
Defendant Gaylene Rogers Lonergan ("Lonergan"), Landmark's insured, is a licensed *672 attorney providing legal services in Dallas, Texas. (Id. at 3.) The Lonergan Law Firm, PLLC (collectively "Defendants"), is a professional limited-liability company providing legal services from its principal place of business in Dallas, Texas. (Id. )
Christopher Dillon Snell; Brian Lockhard; Impromptu Communications, LLC; Todd Crain; and James L. Springer Jr. (collectively "Intervenor Defendants") are individual and corporate investors involved as lenders in the underlying state-court dispute. (Interv. Defs.' Mot. to Intervene (doc. 15) 5.)
B. The Underlying Dispute
In 2015, N & J Enterprises ("N & J") approached Intervenor Defendants regarding an investment opportunity. (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 43-44.) The opportunity involved the purchase of real property in Dalworthington Gardens, Texas ("the Dalworthington Property"). (Id. ) To invest, Intervenor Defendants would, and did, provide a $ 4.6 million loan to N & J, which then purchased the Dalworthington Property. The loan was secured by granting the Intervenor Defendants certain rights to various assets, including a deed of trust for the Dalworthington Property. (Id. at 47-48).
Defendants presided over the closing of the loan and provided assurances to the Intervenor Defendants that all security documentation concerning the loan's security was properly assembled and executed. (Id. ) Relying upon that assurance, the Intervenor Defendants authorized the funds' disbursement and Defendants, acting as the transaction's escrow agent, released Intervenor Defendants' $ 4,600,000 to N & J in May 2015. (Id. )
In June 2015, the loan matured but N & J failed to make payments to the Intervenor Defendants, who consequently attempted to enforce their rights under various security interests that N & J had provided. (Id. at 48.) One of those security interests was a Bank of America escrow account containing approximately $ 5,000,0000 that resulted from an agreement between N & J and Edward Eddyenton III ("Eddyenton"). (Id. ) As security for the loan, Eddyenton and N & J assigned N & J's rights to the account to the Intervenor Defendants. (Id. ) Lonergan had previously notarized the escrow assignment agreement's signature page and attested that she witnessed the escrow agent, Eddyenton, sign the agreement in her presence. (Id. )
The Intervenor Defendants also attempted to enforce their rights to proceeds from an unrelated real-estate transaction involving N & J that was included in the Dalworthington-Property deal. Previously, Lonergan had notarized an assignment of N & J's property rights to $ 14,000,000 in proceeds from a transaction involving property located on Coombs Creek Drive in Dallas, Texas ("the Coombs Creek Property"). (Id. at 49.)
The enforcement attempts proved to be a fool's errand for the Intervenor Defendants. In doing so, it became clear that the Bank of America escrow account never held more than $ 500, that Eddyenton was an alias of Jonathan Blount ("Blount"), N & J's owner and a career criminal with prior felony convictions for fraudulent investments in Texas and Oklahoma, and that Lonergan had never actually witnessed Blount sign the escrow assignment agreement in her presence. (Id. at 48-49.) Concerning the Coombs Creek Property, Intervenor Defendants learned that Lonergan suspected that N & J held no rights to the property at the time it assigned its rights to the Intervenor Defendants, but *673 never conveyed that information to them. (Id. at 49.)
With all remaining security interests proven fraudulent, the Intervenor Defendants attempted to enforce their rights under the deed of trust on the Dalworthington Property by initiating foreclosure proceedings. (Id. ) However, they soon discovered that Lonergan had inaccurately described the Dalworthington Property in the deed and the Intervenor Defendants were only able to recover from its sale approximately $ 2,900,000 of the $ 4,600,000 loan. (Id. ) What is more, N & J's $ 14,600,000 appraisal of the Dalworthington Property proved to be more than ten times its actual value, which was overlooked by Lonergan. (Id. )
C. Landmark's Professional-Liability Coverage and Underlying State-Court Lawsuit Against Lonergan
Landmark provided professional-liability-insurance coverage to Lonergan between May 2014 and Spring 2017. (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 72); (Interv. Defs'. App'x to Opp'n to Mot. for Summ. J. (doc. 48) 151.)) During that time, Lonergan renewed her policy yearly by completing an application that Landmark subsequently reviewed prior to renewal. (Id. at 68.) The application includes a question asking the applicant if a professional-liability claim or suit has ever been made against the applicant's firm or predecessor firm within the last five years. (Id. at 72.) If the applicant indicated that this was the case, he was required to complete a claims supplement listing and describing those claims. (Id. at 72, 73; 110, 111.) For both the 2015 and 2016 claim periods involved in this case, Lonergan filed a supplement in April 2015 and 2016 when applying to renew her policy.[3] (Id. at 73, 111.)
On May 12, 2015, Landmark issued Lonergan a lawyer's professional-liability-insurance policy for the period between May 8, 2015, through May 8, 2016 ("2015 Policy"), and again for the period between May 8, 2016, and May 8, 2017 ("2016 Policy"). (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 43, 80.) The policies operated on a made-and-reported basis with a retroactive date of May 8, 2014. (Id. )
Certain provisions of both policies, which are identical, are pertinent to resolving the issues before the Court. They are:
Covered Services : [Landmark] will pay on behalf of the Insured as shown in the [d]eclarations, all sums that the Insured becomes legally obligated to pay as [d]amages and associated [c]laim [e]xpenses arising out of a negligent act, error, omission, or [p]ersonal [i]njury, even if the [c]laim asserted is groundless, false or fraudulent, in the rendering of or failure to render [p]rofessional [s]ervices as a [l]awyer, provided that the:
1. [c]laim is first made against the Insured during the [p]olicy [p]eriod, and reported to [Landmark] no later than thirty (30) days after the end of the [p]olicy [p]eriod....
Policy Period : means the period of time stated in the [d]eclarations or any shorter *674 period resulting from policy cancellation or amendment to the policy.
Claim : means a written demand for monetary or non-monetary relief received by the Insured during the [p]olicy [p]eriod, including the service of suit, or the institution of an arbitration proceeding. Additionally, [c]laims that arise from an incident, occurrence or offense first reported by the Insured during the [p]olicy [p]eriod and accepted by [Landmark] in accordance with Part IV. A. Notice of Claim will be considered a [c]laim first made during the [p]olicy [p]eriod.
Notice of Claim : The Insured must notify [Landmark] as soon as practicable of an incident, occurrence or offense that may reasonably be expected to result in a [c]laim. Where notice to [Landmark] of such incidents, occurrences or offenses has been acknowledged as adequate by [Landmark] in writing, subsequent [c]laims derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such [c]laim was first provided. The Insured also must immediately send copies to [Landmark] of any demands, notices, summonses or legal papers received in connection with any [c]laim, and must authorize [Landmark] to obtain records and other information.
(Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 9, 13, 14.)
On July 30, 2015, Intervenor Defendants filed suit against Lonergan in the 17th Judicial District Court, Tarrant County, Texas, alleging breach-of-contract, negligence, and negligent misrepresentation based upon Lonergan's actions in connection with the loan's closing. (Id. at 70-71.) Lonergan was served with process on August 4, 2015. (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 17.) Because the lawsuit had not been initiated as of the 2015 Policy's issuance, Lonergan did not report it in her claim supplement in April 2015. (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 73.)
However, Lonergan did present the matter to Landmark in her April 2016 claim supplement. (Id. at 111.) In that supplement Lonergan described the underlying state-court lawsuit as:
September 2015 - Suit filed against Firm (as title agent), Title Company, Borrower(s), and Guarantor by Lender to the transaction-Regarding non-payment of loan by Borrower; alleged fraud and negligence-Discovery proceeding with Gaylene Rogers Lonergan's deposition being taken; Settlement talks are in process and Borrower is in process of paying outstanding amounts due Lender which will result in full release of all parties with no further liability.
(Id. )
On June 9, 2016, the thirty-day-claim-reporting deadline for the 2015 Policy expired while the underlying state-action progressed. On March 12, 2017, Lonergan transmitted a letter to Landmark seeking coverage in connection with the underlying state-court lawsuit and attaching a state-court order compelling mediation. (Interven. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 126-27.)
Landmark responded to Lonergan's request on March 29, 2017. In its letter, Landmark asserted that "coverage does not exist for the claims asserted against Lonergan in the referenced lawsuit."[4] (Id.
*675 at 131.) The rationale supporting Landmark's decision was that it first received Lonergan's request for coverage on March 12, 2017, and that that request was not made during the 2015 Policy. (Id. at 136.) It also stated that Lonergan failed to provide a copy of the underlying state-court action's petition and summons to Landmark, which violated its notice conditions.[5] (Id. ) Landmark concluded the letter by indicating that it would not be attending the previously scheduled March 30, 2017 mediation. (Id. )
On March 31, 2017, Landmark filed the current lawsuit with this Court seeking a declaratory judgment that it possesses no duty to defend or indemnify Lonergan concerning the claims brought by the Intervenor Defendants in the underlying state-court lawsuit. (Compl. (doc. 1).)
That lawsuit was adjudicated via a bench trial in August 2017. On December 11, 2017, the state court entered a final judgment against Lonergan on the Intervenor-Defendants' claims for negligence and negligent misrepresentation and awarded them actual damages of $ 804,581.76 plus pre-and-post-judgment interest. (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 140.)
III. LEGAL STANDARDS
A. Summary Judgment Standard
When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." Bazan v. Hidalgo Cnty. , 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
To demonstrate that a particular fact cannot be genuinely in dispute, a plaintiff movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), and (b) if the defendant has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is required to consider only the cited materials, it may consider other materials in the record. See Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." Skotak v. Tenneco Resins, Inc. , 953 F.2d 909, 915-16 & n.7 (5th Cir.), cert. denied , 506 U.S. 825, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Instead, parties should "identify specific evidence in the record, and ... articulate the 'precise manner' in which that evidence support[s] their claim." Forsyth v. Barr , 19 F.3d 1527, 1537 (5th Cir. 1994).
In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." Sanders-Burns v. City of Plano , 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). "After the non-movant has been given the opportunity to *676 raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." Byers v. Dallas Morning News, Inc. , 209 F.3d 419, 424 (5th Cir. 2000) (citing Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ).
B. Controlling State Law
Since federal jurisdiction in this case arises from a diversity of citizenship, the Court applies the forum state's substantive law. ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc. , 699 F.3d 832, 839 (5th Cir. 2012) (citing Erie R.R. Co. v. Tompkins , 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ). The parties' briefing does not dispute that Texas law applies to the Court's interpretation of the 2015 and 2016 Policies in this instance.
Under Texas law, insurers may have two responsibilities regarding policy coverage--the duty to defend and the duty to indemnify. Id. (quoting Gilbane Bldg. Co. v. Admiral Ins. Co. , 664 F.3d 589, 594 (5th Cir. 2011) (citation omitted)). The Texas Supreme Court has explained that these duties are distinct and are to be decided separately. Gilbane Bldg. Co. , 664 F.3d at 594. While the duty to defend is broader than the duty to indemnify, in some cases the same factors that negate the duty to defend will also negate the duty to indemnify. See Northfield Ins. Co. v. Loving Home Care, Inc. , 363 F.3d 523, 527-28 (5th Cir. 2004) (citation omitted); see also Farmers Tex. Cty. Mut. Ins. Co. v. Griffin , 955 S.W.2d 81, 84 (Tex. 1997).
1. Duty to Defend
In Texas, a district court determines an insurer's duty to defend by following the eight-corners rule. Liberty Mutual Ins. Co. v. Graham , 473 F.3d 596, 599 (5th Cir. 2006). Under this rule, the Court examines only the allegations in the underlying petition and the insurance-policy's language to determine whether a duty to defend arose. Id. at 600. The Court's assessment, however, remains limited. It cannot read facts into the pleadings, look outside of them, or speculate as to factual scenarios that might trigger coverage or give rise to ambiguity. Gilbane Bldg. Co. , 664 F.3d at 596-97. If the petition's facts, taken as true, potentially raise a coverage claim under the policy, an insurer becomes obligated to defend the insured. Colony Ins. Co. v. Peachtree Constr., Ltd. , 647 F.3d 248, 253 (5th Cir. 2011) (citing GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church , 197 S.W.3d 305, 308 (Tex. 2006) ). Any doubts are resolved in the insured's favor. Graham , 473 F.3d at 602.
2. Duty to Indemnify
Under Texas law, the duty to indemnify is based upon the actual facts that underlie the cause of action and terminate in liability. Northfield Ins. Co. v. Loving Home Care , 363 F.3d 523, 528-29 (5th Cir. 2004) (citing Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. , 99 F.3d 695, 701 (5th Cir. 1996) ). In general, Texas law only considers the duty-to-indemnify question justiciable after the underlying suit is concluded unless, "the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." Id. (quoting Griffin , 955 S.W.2d 81, 84 (Tex. 1997) ).
IV. ANALYSIS
The crux of this case requires the Court to identify the point along the chronology of interaction between Lonergan and Landmark at which the claim was reported in the manner required by the professional-liability policy. Landmark argues that Lonergan only so reported the claim on March 12, 2017, when she transmitted *677 a letter to Landmark demanding coverage in connection with the underlying state-court lawsuit and attaching the state-court order compelling mediation. (Pl.'s Mot. for Summ. J. (doc. 39) 11.) That would mean that Lonergan would not have properly reported the claim under the 2015 Policy, whose reporting deadline expired on June 9, 2016, and would not have been entitled to coverage under the 2016 Policy because it related to an occurrence preceding the 2016 Policy's effective date. The Court agrees with this argument.
A. The Duty to Defend
At the outset, it is undisputed that both policies are of the claims-made-and-reported variety. (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 7; (Pl.'s App'x to Mot. for Summ. J. 80.)) That means that a claim must be made against the insured during the policy period and the insured must also notify the insurer of the claim during that same period to receive coverage. Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co. , 174 F.3d 653, 658-59 (5th Cir. 1999).
1. Assessing the Claim's Subject Matter
An examination of the substance of the underlying state-court petitions and Lonergan's 2015 Policy does indicate that a duty to defend would have arisen in this situation. Here, an explanation of the nature of Lonergan's actions becomes instructive. In the underlying state-court action, Intervenor Defendants alleged that Defendants were professionally negligent in performing their responsibilities as title agents and closers for the loan transaction. (Pl.'s App'x in Support of Mot. for Summ. J. (doc. 40-1) 33.) More specifically, Defendants 1) never notified Intervenor Defendants that Blount was a convicted felon; 2) did not witness the signing of documents by Blount involving the Bank-of-America escrow account and failed to disclose that fact to Intervenor Defendants; 3) did not disclose that N & J owned no interest in the Coombs Creek Property; and 4) failed to ensure that critical documents were properly executed and acknowledged. (Id. )
When these alleged negligent acts are analyzed against the 2015 Policy's provisions, the Court concludes that three of these allegations would potentially amount to viable claims.[6] The remaining allegations' subject matter would fall under the rubric of "Professional Services" as defined by the 2015 Policy. Those services are described as "only services performed for others by an Insured as an escrow agent, lawyer, notary public, administrator, conservator, executor, guardian ad litem, arbitrator, mediator, trustee, and title insurance agent." (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 48.) There is no dispute that the pleadings allege that Defendants acted as escrow agent and lawyer regarding the underlying fraudulent real-estate transaction and that those actions implicate the policy's "Professional Services" provisions.
2. Assessing Notice of the Claim to Landmark
However, just because a claim's subject matter falls under an insurance-policy's provisions does not necessarily make the claim viable. Because this case involves a claims-made-and-reported policy, the insurer must also be notified of the claim during the policy period to receive coverage.
*678 Matador , 174 F.3d at 658-59. Because the claim was untimely, that is, Defendants did not properly report it to Landmark during the policy period, the Court concludes that Landmark possessed no duty to defend Defendants in the underlying state-court action.
Defendants argue that Lonergan's inclusion of a claim supplement in April 2016 was sufficient to place Landmark on notice of a claim's being filed within the 2015 Policy period--triggering its duties to defend and indemnify. (Interv. Defs.' Opp'n to Pl.'s Mot. for Summ. J. (doc. 47) 6.) However, the 2015 Policy provisions belie this argument.
To be considered a "claim" under the policy, a request to defend and indemnify must amount to "a written demand for monetary or non-monetary relief." (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 49.) Since the term "demand" is unambiguous in the 2015 Policy, the Court applies its plain meaning. Puckett v. U.S. Fire. Ins. Co. , 678 S.W.2d 936, 938 (Tex. 1984) ("When there is no ambiguity, it is the Court's duty to give the words used their plain meaning.") Black's Law Dictionary defines "demand" as the "assertion of a legal or procedural right."[7]
It is this assertion of a legal or procedural right that the Court looks for when assessing the text of Lonergan's claim supplement. That supplement states:
September 2015 - Suit filed against Firm (as title agent), Title Company, Borrower(s), and Guarantor by Lender to the transaction-Regarding non-payment of loan by Borrower; alleged fraud and negligence-Discovery proceeding with Gaylene Rogers Lonergan's deposition being taken; Settlement talks are in process and Borrower is in process of paying outstanding amounts due Lender which will result in full release of all parties with no further liability.
(Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 111.) It is clear that the supplement contains no assertion of a legal or procedural right.[8] What it does contain is a concise synopsis of the underlying dispute sufficient to apprise Landmark of its subject-matter and progress but remains devoid of a coverage request under the 2015 Policy. The Court does not consider this submission as sufficient to satisfy the definition of a "claim" per the 2015 Policy's own terms and, therefore, it amounts to nothing more than an informal communication to Landmark about "an incident, occurrence or offense that may reasonably be expected to result in a [c]laim. " (Id. at 50 (emphasis added).)
This holding aligns with others issued by federal circuit and district courts nationwide.[9] The United States Court of Appeals for the Eighth Circuit has held that information contained in a renewal application that did not impart effective notice of a claim to an insurer did not trigger the obligation to defend under a claims-made policy where that information *679 did not address a claim or potential claim within the meaning of the policy . F.D.I.C. v. St. Paul Fire & Marine Ins. Co. , 993 F.2d 155, 159 (8th Cir. 1993). Likewise, the Tenth Circuit similarly determined that information contained in an insured's renewal application did not amount to the notice of a claim or potential claim that was required to trigger coverage obligations under a claims-made-directors-and-officers policy. LaForge v. Am. Cas. Co. of Reading, Pa. , 37 F.3d 580, 584 (10th Cir. 1994). More recently in Am. Cas. Co. of Reading, Pa. v. Continisio , 17 F.3d 62 (3d Cir. 1994) the Third Circuit held that an insureds' submission of a renewal application for a claims-made policy did not satisfy a policy requirement that insureds give timely written notice of claim at a specified address. Atlantic Health System, Inc. v. National Union Fire Ins. Co. of Pittsburgh , 463 F. App'x 162, 167-68 (3d Cir. 2012). Such case law confirms the rationale in this instance that a renewal application's submission cannot trigger rights and obligations to defend an insured where such application did not provide claim-conforming language that would signal to an insurer that the insured is seeking intervention.
Moreover, Lonergan did not forward any suit papers along with her application that would have conveyed that she was attempting to transmit more than just a synopsis of the underlying suit. "[T]he Supreme Court of Texas has consistently held that an insurer has no duty to defend or to indemnify an insured unless the insured forwards suit papers and requests a defense in compliance with the suit's notice-of-suit conditions." Hudson v. City of Hous. , 392 S.W.3d 714, 725 (Tex. App. 2011). Without such papers and claim-conforming language, Landmark owed no duty to provide Lonergan's unsought defense. Nat'l Union Fire Ins. Co. of Pittsburgh v. Crocker , 246 S.W.3d 603, 610 (2006) ("Insurers owe no duty to provide an unsought, uninvited, unrequested, unsolicited defense.").
Intervenor Defendants oppose Landmark's motion on the theory that the 2015 Policy's reporting provision should be afforded its plain meaning and, by doing so, the provision contains no limitations as to how an insured would notify Landmark of a request to defend and indemnify.[10] (Interv. Defs.' Opp'n to Pl.'s Mot. for Summ. J. (doc. 47) 22-25.) Under this construction, Intervenor Defendants argue that Texas courts "have long held that the plain meaning of "report" is, quite simply, 'something that gives information', 'to convey or disseminate information,' 'any statement of fact,' and 'information provided or conveyed.' " (Interv. Defs.' Opp'n to Pl.'s Mot. for Summ. J. (doc. 47) 22 (internal citations omitted).) Therefore, Defendants insist, Lonergan's inclusion of a description of the state-court action in her April 2016 claim supplement amounts to a claim's being "reported" under the 2015 Policy since it conveyed basic information about the underlying lawsuit.
This theory is unpersuasive for two reasons. First, Texas law requires that a court "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." Seagull Energy E & P v. Eland Energy , 207 S.W.3d 342, 345 (Tex. 2006) (emphasis original) (internal quotation and citation omitted). Put more directly, courts *680 do not read contractual provisions in isolation from one another. In re Ford Motor Co. , 211 S.W.3d 295, 298 (Tex. 2006) (per curiam). "Nor do [courts] consider only the [terms] favoring one party and disregard the remainder." City of Keller v. Wilson , 168 S.W.3d 802, 811 (Tex. 2005).
While the plain-meaning definitions supplied by Intervenor Defendants certainly apply to "reporting" in this instance, the provision, itself, contains limiting language through its incorporation of the term "claim." The Court interprets these terms to mean that whatever information is conveyed to Landmark within the 2015 Policy's temporal term must be reflected in language consistent with its definition of "claim." In other words, the insured must convey the information couched in language that requests intervention in the matter. That language is missing in the description Plaintiff used in describing the state-court case to Landmark in this instance.
Moving beyond the reporting provision's language, the Court has identified further terms that narrow the scope for reporting a claim under the 2015 Policy. The contract's "Notice-of-Claim" condition requests that all claim information directed to Landmark be sent to its claims department via mail or e-mail. (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 50.) The Court interprets this provision to mean that the conveyance of claim-coverage information under the reporting policy's terms must be directed to the claims department in the required format to provide adequate notice of a claim's filing. The record simply does not indicate that Lonergan did so in this situation; her supplement merely conveyed information about the state-court lawsuit but did not amount to a reported claim under the 2015 Policy.
Second, the Court is dissuaded from following Intervenor-Defendants' theory because of the comprehensive effect its impact would have upon insurers. Adopting this rationale would essentially allow insureds to "report" claims in a myriad of ways beyond those stipulated to in professional-liability-coverage agreements. This would mean that insurers would have to comb thoroughly through any transmission received from an insured to assess whether even the mere mention of a possible actionable claim was contained in its contents. Such a reality would eviscerate the lines between claims, underwriting, and other intake departments and force insurers to act like overprotective parents reflexively checking in on their broods to assess whether their intervention was needed in response to every disagreement brought to their attention. The Court declines, as others have, to adopt this rationale. See Continisio , 17 F.3d at 69 ("We join a growing line of cases prohibiting an insured from insisting that its insurer's underwriting department sift through a renewal application and decide what should be forwarded to the claims department on the insured's behalf."). Because Lonergan did not provide effective notice until March 2017, there is no coverage under the 2015 Policy.[11]
B. Duty to Indemnify
Unlike the duty to defend, the "facts actually established in the underlying suit control the duty to indemnify." D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co. , 300 S.W.3d 740, 744 (Tex. 2009). The "insurer's duty to indemnify depends on the terms of the policy." Id. If the policy *681 fails to provide coverage for the claims made in the underlying suit, an insurer possesses no duty to indemnify its insured. Mid-Continent Cas. Co. v. Castanga , 410 S.W.3d 445, 450 (Tex. App. 2013) (citing W. Heritage Ins. Co. v. River Ent'l , 998 F.2d 311, 315 (5th Cir. 1993) ). Under Texas law, when the insurer relies upon a policy's exclusions to preclude coverage, the insurer bears the burden of proving that one or more of those exclusions applies. Id. (citation omitted).
Having determined that Lonergan's April 2016 claims supplement did not amount to adequate notice under the 2015 Policy, the Court concludes that Landmark has proven that the policy's exclusions preclude coverage under either version regarding any duty to indemnify. Concerning the 2015 Policy, Lonergan did not file a notice of claim regarding the underlying state-court lawsuit during this policy period. It follows that Plaintiff's 2017 formal claim for defense and indemnification would be excluded by the 2015 Policy's "Covered-Services" provisions that mandate that the claim "is first made against the Insured during the [p]olicy [p]eriod, and reported to [Landmark] no later than thirty (30) days after the end of the [p]olicy [p]eriod...." (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 45.)
Likewise, Landmark possesses no duty to indemnify under the 2016 Policy. That is because two exclusions bar Lonergan's request from becoming actionable. Exclusion G prohibits:
[a]ny alleged act, error, omission, Personal Injury or circumstance likely to give rise to a [c]laim that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to, any prior [c]laim or prior [c]laim or possible [c]laim referenced in the Insured's application.
(Id. at 48.) Exclusion G bars Landmark's duty to indemnify because Lonergan's March 2017 request relates to a possible claim referenced in her 2016 application prior to the 2016 Policy's effective date of May 8, 2016.
Still further, Exclusion V would also preclude Landmark's obligation to indemnify in this situation. This exclusion bars indemnification for:
any [c]laim or litigation against any Insured occurring prior to, or pending as of the inception date of this policy including (but not limited to) [c]laims, demands, causes of action, legal or quasi-legal proceedings, decrees, or judgments; or any subsequent litigation or [c]laims arising from or based on substantially the same matters alleged in the pleadings of such prior or pending litigation; or any act, error, omission or [p]ersonal [i]njury of any insured(s) which gave rise to such prior or pending litigation or [c]laims.
(Id. at 49.) Because the underlying state-court litigation was initiated in July 2015 it falls outside of the scope of the 2016 Policy because it was pending as of the 2016 Policy's inception date. Therefore, the Court concludes that there are no circumstances under which Landmark would have a duty to indemnify in this situation.
V. CONCLUSION
For the reasons explained above, the Court GRANTS Landmark's motion for summary judgment (doc. 38) that it possessed no duty to defend or indemnify Defendants concerning the underlying state-court lawsuit.

This case involves a complex underlying dispute concerning a real-estate-transaction scam. Much of the factual background to the scam is immaterial to the current issues before the Court. Therefore, the Court only includes as much factual background as is necessary to promote the parties' understanding of the Court's resolution of the motion.

Landmark is technically a subsidiary of RSUI Group, Inc. ("RSUI"), that has no employees. All professional liability policies are issued as Landmark policies, but RSUI remains the parent company. (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 170.)

The Court notes that Lonergan filed the supplement in response to question 17 in both applications. That question, however, asks whether the firm or any of its members or former members has provided services relating in any way to a security or to activities or transactions subject to the Securities Act of 1933-34. In both instances, Lonergan answered in the negative which would not trigger a claims-supplement's submission. In reviewing the application, the Court recognizes that Lonergan's claim supplement is clearly responsive to question 24's prompt. (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 73, 111.)

The letter also pointed to correspondence between Lonergan and Landmark on August 2, 2016, in which Landmark purportedly discussed only the alleged claims against Lonergan and the facts necessary to those allegations. The letter, however, was not included in the record currently before the Court.

Landmark also asserted that a variety of the Policy's substantive provisions would not cover Lonergan's claims even if the claim had been reported in a timely manner. (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 137.)

The Court determines that Policy Exclusion L would exclude coverage concerning the circumstances surrounding Lonergan's notarization of Blount's signature on the escrow agreement. Exclusion L prohibits coverage for any claim arising out of "[t]he notarization of a signature without the physical presence of the signator before the Insured." (Pl.'s App'x to Mot. for Summ. J. (doc. 40-1) 48.)

Demand , Black's Law Dictionary (10th ed. 2014).

The Court notes the contrast between the text of Lonergan's April 2016 claim supplement and her March 12, 2017 letter to Landmark requesting coverage. The letter states that "[p]ursuant to the terms of my Lawyers Professional Liability Coverage, I am forwarding a request for coverage in connection with an existing lawsuit ...." and definitively invokes Defendants' coverage under its 2016 Policy. (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 126.)

The issue of whether a claim supplement contained in a professional-insurance-coverage-policy application can constitute a notice of claim has remained unaddressed by both Texas courts and the United States Court of Appeals for the Fifth Circuit.

For ease of reference, the reporting provision states that Landmark will provide services if the [c]laim is first made against the Insured during the [p]olicy [p]eriod, and reported to [Landmark] no later than thirty (30) days after the end of the [p]olicy [p]eriod...." (Interv. Defs.' App'x to Opp'n to Pl.'s Mot. for Summ. J. (doc. 48) 9, 13, 14.)

Because the Court has determined that Lonergan did not provide adequate notice of claim under the 2015 Policy, an analysis of the notice-prejudice rule is unnecessary here. Prodigy Commc'n Corp. v. Agric. Excess & Surplus Ins. Co. , 288 S.W.3d 374 (Tex. 2009).